198 N.J. Super. 435 (1985)
487 A.2d 751
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SRENTEN (SRETEN) VUJOSEVIC, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 7, 1985.
Decided January 30, 1985.
*438 Before Judges MORTON I. GREENBERG, O'BRIEN and GAYNOR.
Anderson D. Harkov, Assistant Deputy Public Defender, argued the cause for appellant (Joseph H. Rodriguez, Public Defender, attorney; Anderson D. Harkov, of counsel and on the brief).
Kenneth M. Denti, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General, attorney; Brian Granstrand, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, P.J.A.D.
This matter comes on before this court on defendant's appeal from a judgment of conviction for aggravated manslaughter entered on a verdict at a jury trial. This verdict was returned as a lesser included offense on an indictment charging defendant with the murder of Frederick Baron contrary to N.J.S.A. 2C:11-3. Defendant was sentenced to 20 years imprisonment with a parole ineligibility period of ten years and was assessed a $3,000 penalty for the use of the Violent Crimes Compensation Board.
This case involves conduct of extraordinary depravity. At about noon on Friday, July 17, 1981 defendant began a day of drinking beer, wine and whiskey. Sometime between 5:30 and 7:00 p.m. defendant and some friends walked up an embankment to the Conrail railroad tracks near Elmora Avenue in *439 Elizabeth to continue their drinking. These tracks are a local "hang-out" where people sometimes go to drink, especially during the summer. After a while defendant and his friends left the tracks and went to Carteret Park where defendant resumed drinking. Around 10:30-11:00 p.m. defendant, Ronald St. Laurent and William Treacy went back to the tracks where they sat on a parked flatbed train and smoked marijuana. Not surprisingly defendant appeared to be drunk. Five to ten minutes later, the victim, Frederick Baron, approached defendant and his friends. Treacy testified that at that time defendant and St. Laurent jumped off the train and began harassing Baron. Defendant asked Baron for a cigarette three times and asked him where he was going two or three times. Baron stated he was headed toward Broad Street, asked to be left alone and said "let me walk." Baron tried to continue but was unable to proceed because defendant was pushing him. After seeing defendant push Baron, Treacy went home.
That same evening Darlene Kirby and three of her friends walked up the embankment near the Jersey Mortgage Company parking lot in Elizabeth and sat on the Conrail railroad tracks at approximately 10:30 p.m. After a while Kirby and her friends walked down the embankment and saw two men, defendant and St. Laurent, walking toward them coming from the direction of Elmora Avenue. Kirby recognized them. She had previously seen defendant six or seven times and knew St. Laurent, as "Ray." Kirby saw blood on defendant's shirt, socks and sneakers. Defendant stopped and talked to Kirby and her friends in the Jersey Mortgage parking lot.
Kirby testified that defendant kept flicking a lighter and saying that nothing would have happened if only "he just would have gave us a cigarette." Defendant said that he "bashed some guys head on the tracks" and that Ray choked him "until his eyes popped out of his head." Defendant told Kirby and her friends not to tell anyone. Kirby subsequently corrected her testimony and indicated it was St. Laurent who talked about the cigarette. Kirby then heard someone up on the *440 tracks crying for help. In response to the cry defendant commented that "if he ain't dead now by the time the cops get there he'll be." Kirby and one of her friends, Laurie Pisarczyk, then left the area where she had talked to defendant to go home while defendant and St. Laurent walked up Westfield Avenue toward a White Castle. When Kirby and her friend reached Kirby's home they told Kirby's mother what happened and her mother called the police.
Officer Patrick Shannon of the Elizabeth Police Department and his partner responded to a report of an injured man in the area of the Jersey Mortgage Company. When they drove into the Jersey Mortgage parking lot they saw defendant and another man. Shannon stopped and asked them if they were all right. Defendant responded that he was all right and was going home. At this point Shannon suspected no one of any criminal activity and defendant and his companion departed. Shannon observed that defendant's clothes appeared to be dirty. The officers then made a short search of the embankment but found nothing and left.
Kirby's mother had been able to observe the police search. She concluded it was in the wrong area and consequently called the police and so advised them. The officers then returned to the area and made a broader search during which they found Baron lying on the tracks. His pants were completely pulled down and his sweater was pulled up around his shoulders. The back of his head was severely injured and there was a lot of blood on his face. The side of his body was discolored, showed several lacerations and appeared to be caved in. Some black material which appeared to be burned grass and weeds was found around the head. The officer could not find a pulse on the body and concluded that Baron was dead.
Shannon then saw Kirby and Pisarczyk coming towards him. They had walked back to the tracks after Kirby's mother directed the police to the appropriate area. As a result of his conversation with the girls, Shannon became aware of defendant's *441 nickname, "Strech," and the police began to search the area for the two men they had first seen when they arrived at the tracks. Eventually the police were directed to an address in Elizabeth approximately two blocks from where the body was found. Shannon looked through the kitchen window and saw defendant inside the house. He notified police headquarters of the situation but did not enter until a search warrant was obtained. The police then entered the house and arrested defendant. At that time he appeared dirty and there was fresh blood on his shorts, shirt, arms and legs. Shannon read him his Miranda rights.[1]
Dr. Shigeo Kondo, the assistant Union County medical examiner, came to the homicide scene at approximately 2:00 a.m. on July 18, 1981. The body was still there. Kondo noticed the burnt grass and observed that someone tried to burn the body. He said that Baron's eyes were black and swollen and his shoulders were burned and injured. Kondo pronounced Baron dead and determined that the cause of death was asphyxiation due to strangulation. An autopsy was later performed. It showed hemorrhaging on the forehead and in the head, severe injuries to the eye area due to repeated beating, first and second degree burns to the shoulders, deep laceration of the lip, multiple fractured and broken ribs, a punctured lining of the chest cavity and a flattening of the vocal cord from external force.
When defendant was arrested and given his Miranda rights he had nothing to say. Approximately 20-25 minutes later in the holding cage in Elizabeth Police Department defendant was again advised of his constitutional rights and again indicated he had nothing to say. Detective John Mottley, who supervised the investigation of the homicide, again advised the defendant of his constitutional rights at 10:04 a.m. on July 18, 1981. Defendant signed a waiver of his rights and gave Detective *442 Mottley an oral statement that he had been drinking and did not remember anything that happened after 10:00 p.m. on July 17, 1981. Defendant would not then give a written statement.
On July 19, 1981 at approximately 9:00 p.m., Detective Mottley again advised defendant of his Miranda rights and informed him that his brother had been arrested and charged with the homicide. While his brother was in custody it appears that the police already had information tending to exculpate him. Mottley asked defendant whether he wanted to change his mind and give a statement concerning his brother and himself. At 9:40 p.m. defendant agreed to give a written statement. Defendant stated that he, Ronald St. Laurent and William Treacy were sitting on top of flatcars on the railroad tracks behind the Pathmark when a white male came walking along the tracks and stopped and talked. Treacy left and the man sat down and Ron talked to him. Defendant left to urinate and when he returned he discovered St. Laurent hitting the victim. Defendant claimed that he also hit the victim a few times in the face and kicked him once or twice on the side. St. Laurent continued to hit the victim and defendant tried in vain to stop him. Then defendant and St. Laurent left the tracks and met some friends with whom they talked and drank beer before going home. When they left the tracks the victim was "just laying there and he wasn't moving."
Immediately prior to the jury phase of the trial defendant moved to suppress his statements. The trial judge conducted a Miranda hearing and excluded the written statement. The judge stated that proper Miranda warnings were given but that defendant was unconstitutionally "conned" into giving the statement. The State then sought leave to appeal and we granted the motion and summarily reversed. Thus the written statement was admitted at the trial.
The State offered into evidence three color photographs of Baron lying on the tracks. Defendant objected to them claiming that their prejudicial impact outweighed their probative *443 value. The court described the photographs for the record. Obviously they were graphic. Eventually the photographs were admitted into evidence.
Michael Baker who had been an inmate at the Union County jail when defendant was there following his arrest testified for the State. Baker told the jury how defendant described to him that he and St. Laurent had beaten a man. Defendant told Baker that he punched the victim in the face, knocked him down and kicked him and then started choking him. Defendant demonstrated to Baker how the choking was done. Defendant said that he and St. Laurent looked for twigs, brush and leaves and attempted to set the victim on fire to get rid of the evidence.
Defendant testified to essentially the same version of events as those in his written statement. He stated that after he came back from urinating he saw St. Laurent attacking the victim. Defendant then tried to stop him but when St. Laurent told him that the victim made homosexual advances something snapped in defendant's head and defendant hit him. The man fell and St. Laurent started kicking him. Defendant kicked him once and as he was going to kick him again the man stopped defendant by grabbing defendant's foot. At that point defendant told St. Laurent to stop but he refused. Defendant said he left the scene before St. Laurent.
Defendant asked that the jury be charged that it could find him guilty of the lesser offense of "assault." Defendant conceived himself entitled to this charge because in his view the evidence showed that he did not cause the victim's death. The court refused the charge but did charge the jury could find defendant guilty of murder, aggravated manslaughter or manslaughter. Of course the judge also told the jury defendant could be acquitted. Defendant was convicted of aggravated manslaughter and this appeal followed.
Defendant raises the following issues on this appeal.

*444 (1) The court erred by failing to charge the jury on the lesser included offense of aggravated assault under N.J.S.A. 2C:12-1b(1).
(2) Defendant's written statement was obtained in violation of his expressed desire to remain silent and as a result of coercion in violation of his rights under the United States and New Jersey Constitutions.
a. Defendant's written statement was obtained after he repeatedly invoked his right to remain silent thus violating his constitutional rights.
b. Defendant's statement was involuntary and was obtained only as a result of telling him his brother would not be released unless he confessed.
(3) The admission of Kirby's testimony regarding Ronald St. Laurent's statements to her about the homicide violated the hearsay rule and defendant's Sixth Amendment right to confront the witnesses against him.
(4) The court erred by allowing into evidence three photographs of the victim's body which were so gruesome that they were likely to be inflammatory and prejudicial against defendant.
(5) The imposition of a State prison term of twenty years with a ten year period of parole ineligibility was manifestly excessive.
We deal first with defendant's contention that aggravated assault should have been charged. We are satisfied that the evidence might have caused the jury to have a reasonable doubt as to whether defendant was guilty of a homicide for it could have questioned whether defendant's acts caused Baron's death or caused serious bodily injury resulting in his death. It might have concluded that notwithstanding defendant's assaults on Baron he died solely from the actions of St. Laurent. While such a result would have been extraordinary in theory the jury could have reached it. Consequently an aggravated assault charge should have been given. See State v. Choice, 98 N.J. 295 (1985); State v. Powell, 84 N.J. 305 (1980); State v. Zelichowski, 52 N.J. 377, 383-384 (1968); State v. Lopez, 160 N.J. Super. 30, 37 n. 2 (App.Div. 1978); State v. Quinones, 140 N.J. Super. 237, 240 (App.Div. 1976), aff'd N.J. 391 (1978). Ordinarily, therefore, even in the face of the overwhelming weight of evidence that defendant was guilty of aggravated manslaughter, we would reverse and remand this case for a new trial.
But there are unusual circumstances here that render the error in the charge harmless. The judge's charges on murder, aggravated manslaughter and manslaughter were thorough *445 and in themselves certainly not objectionable. He told the jury that in an aggravated manslaughter case the State was obliged to prove beyond a reasonable doubt that defendant acted recklessly under circumstances manifesting extreme indifference to human life. He emphasized that the State was obliged to prove beyond a reasonable doubt that defendant's actions caused the death for the jury to convict defendant of aggravated manslaughter. In charging on manslaughter the judge indicated that the jury had to find that defendant recklessly caused Baron's death to be convicted. The jury was critically concerned with the distinctions among the three offenses for during deliberations it asked the judge to explain their distinctions again and he did so. As we have indicated the jury returned a verdict of guilty on aggravated manslaughter.
We are convinced that the jury returned the verdict it did because it found defendant guilty of aggravated manslaughter beyond a reasonable doubt and would have reached the same verdict even if aggravated assault had been charged. It is improper for a judge not to charge a lesser included offense supported by the evidence because he should not control the result and force an all-or-nothing verdict. Thus usually it is coercively prejudicial to give the jury a choice of an all-or-nothing verdict. State v. Lopez, supra, 160 N.J. Super. at 36-37. As the Supreme Court of the United States has indicated, when the defendant is clearly guilty of some offense and the evidence warrants a conviction for a lesser offense than the offense charged, as here, there is a substantial risk that in practice a jury when charged only on the greater offense may return a guilty verdict even though in doubt as to the proof of some of the elements of the greater offense, rather than allow the defendant to go free. Beck v. Alabama, 447 U.S. 625, 634, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392, 401 (1980).
Here it is clear that the jury was not in reasonable doubt as to the proof of any of the elements of aggravated manslaughter because surely if it had been but had not desired *446 completely to acquit defendant it would have returned a verdict of guilty to the lesser charge of manslaughter. We cannot believe that if the jury thought defendant was not responsible for Baron's death it would have convicted him of an offense more serious than the least severe homicide charge available to it. While it is true that the judge did not explain the difference in possible penalties in aggravated manslaughter and manslaughter cases the very term "aggravated" connoted the more serious nature of the offense. Accordingly we hold that on the unusual facts here the failure of the judge to charge aggravated assault was harmless error. We emphasize that we reach this result not because of our agreement with the verdict which is supported by the overwhelming weight of the evidence but because the jury itself has conclusively demonstrated that it found defendant guilty of aggravated manslaughter beyond a reasonable doubt. Thus we conclude beyond any reasonable doubt that the error of the trial court did not contribute to the verdict and should not lead to a reversal. State v. Collier, 90 N.J. 117, 123-124 (1982).[2]
We decline to reach defendant's contention that his written statement was unlawfully obtained. This statement was originally suppressed by the trial court at a hearing on January 21, 1982, apparently on the grounds that the statement was involuntary. The court, however, found no Miranda violations. The State moved for leave to appeal. This court granted leave to appeal and summarily reversed on January 25, 1982 and thus the statement was admitted. At oral argument before us defendant suggested that he may not have advanced at the time of the interlocutory appeal all the arguments in support of *447 the result, suppression of his written statement, reached by the trial court. Defendant questions the trial judge's ruling that Miranda was not violated. We are not clear whether defendant's Miranda position was advanced on the earlier appeal. But inasmuch as the application for leave to appeal allowed us to consider the merits of the appeal on the papers submitted on the motion defendant was free to present any argument in support of the result reached in the trial court. R. 2:11-2; Chimes v. Oritani Motor Hotel, Inc., 195 N.J. Super. 435, 443 (App.Div. 1984). Accordingly under State v. Stewart, 196 N.J. Super. 138 (App.Div. 1984), certif. den. 99 N.J. ___ (1984) our earlier decision is the law of the case.
In arguing against Stewart defendant cites R. 2:2-5 which provides that a judgment on an interlocutory appeal in the Appellate Division is interlocutory and not appealable to the Supreme Court as a final judgment. We do not see how this rule assists defendant in this court. Stewart did not and could not have decided the binding effect of a decision of the Appellate Division on a later appeal to the Supreme Court. Only the Supreme Court may decide that issue. Stewart simply held the prior result binding in the Appellate Division and the trial court.
Further we note that in any event under Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the case on which defendant's Miranda argument is primarily predicated, the written statement was not barred. Michigan v. Mosley was concerned with the police resuming questioning after a defendant elected to remain silent. The court did not preclude further questioning provided that when the defendant initially elected to remain silent his decision was scrupulously honored. Here the police did scrupulously honor defendant's decision to remain silent. Further there was a significant interval between the time when defendant had been given the Miranda warnings on July 18 and when he was again advised of these rights on July 19 and then gave the written statement. In these circumstances notwithstanding defendant's prior refusal *448 to give a statement the written statement was not obtained in violation of defendant's Miranda rights. See 423 U.S. at 104-106; 96 S.Ct. at 326-327; 46 L.Ed.2d at 321-322. Finally defendant did not involuntarily give the statement. Defendant's brother was in custody. It was for defendant to decide whether in that circumstance he should make a statement. Defendant knew he was involved and his brother was not. He chose to clear his brother. Thus even if we considered the admissibility of the written statement on the merits we would uphold the conviction.
There was no reversible error in the admission of the statements Kirby originally indicated were made by defendant and were later attributed to St. Laurent. When Kirby corrected her testimony and attributed the statements to St. Laurent defendant moved for a mistrial, a motion addressed to the discretion of the trial judge. State v. DiRienzo, 53 N.J. 360, 383 (1969). He denied the motion and instead told the jury the statements could not be used to inculpate defendant and what St. Laurent said could not be used as proof against defendant. We see no reason to believe the jury did not comply with the instruction. State v. Manley, 54 N.J. 259, 270 (1969). But even if it did not the incident could not have harmed defendant. Defendant testified in this case and placed the major share of the blame on St. Laurent, a position consistent with his written statement. In fact St. Laurent's statement tended to corroborate defendant's version of the events. Thus even if the jury disregarded the judge's instructions not to use St. Laurent's statement against defendant he was not harmed.
There was no error in the admission of the photographs. Certainly the brutal nature of the beating was in issue in this case and thus the photographs were of probative value to demonstrate defendant's conduct. They were properly admitted. See State v. Thompson, 59 N.J. 396, 420 (1971).
*449 We do not find any abuse of discretion in the sentence. State v. Hodge, 95 N.J. 369, 379 (1984); State v. Roth, 95 N.J. 334, 367 (1984).
The judgment of conviction is affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] State v. Collier was concerned with the type of showing necessary to overcome error of constitutional dimension. While that showing was made here we are not to be understood as suggesting that the failure to charge a lesser included offense necessarily is an error of constitutional dimension. We need not reach the point. Obviously if we judged the failure of the trial court to charge aggravated assault and battery against the harmless error standard of State v. Macon, 57 N.J. 325 (1971) we would affirm.