252 N.J. Super. 100 (1991)
599 A.2d 536
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RASHEED MUJAHID, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 29, 1991.
Decided November 15, 1991.
*103 Before Judges O'BRIEN, HAVEY and CONLEY.
Wilfredo Caraballo, Public Defender, attorney for appellant (Robert Brigliadoro, Designated Counsel, on the brief).
*104 Robert J. Del Tufo, Attorney General, attorney for respondent (Annmarie Cozzi, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by CONLEY, J.S.C., temporarily assigned.
Following a jury trial, defendant was convicted of one count of second degree aggravated arson, in violation of N.J.S.A. 2C:17-1a(1) and (2) (Count 1); two counts of felony murder, in violation of N.J.S.A. 2C:11-3a(3) (Counts 2 and 3); two counts of first degree knowing and purposeful murder, in violation of N.J.S.A. 2C:11-3a(1) and (2) (Count 4 and 5); two counts of first degree attempted murder, in violation of N.J.S.A. 2C:5-1 and 2C:11-3 (Counts 7 and 8); and twenty counts of second degree aggravated assault, in violation of N.J.S.A. 2C:12-1b(1) (Counts 9 to 28).
Prior to sentencing, Count 1 was merged with Counts 2 and 3. Count 2 was merged into Count 4, and Count 3 was merged into Count 5. A life term with a 30 year period of parole ineligibility was then imposed on Count 4 and a consecutive life term with a 30 year period of parole ineligibility was imposed on Count 5. A consecutive 20 year term with a 10 year period of parole ineligibility was imposed on Count 7 and a concurrent 20 year term with a 10 year period of parole ineligibility was imposed on Count 8. On Counts 15 and 22, two 10 year terms with a 5 year period of parole ineligibility were imposed, consecutive to the sentences on Counts 4, 5 and 7. Concurrent 10 year terms were imposed on Counts 9 to 21 and 23 to 28. A $30 Violent Crimes Compensation (VCCB) penalty was imposed on each of the non-merged counts. Defendant's aggregate term, thus, totalled two life terms plus 40 years with a total of 80 years parole ineligibility and a total VCCB penalty of $720. A motion for sentence reduction was denied.
*105 The critical facts are as follows. At approximately 3:00 a.m. On February 12, 1988, a woman known as "Waheeda," met defendant and asked him to purchase some cocaine for her. Defendant agreed and went to a known drug area. On the way, he saw Michael Jeter. Defendant approached Jeter and asked him if he knew where to buy cocaine. Jeter replied yes, introduced defendant to Artie Webster, a third-floor resident of a rooming house located at 501 21st Street, who sold cocaine to defendant.
After purchasing the cocaine, defendant followed Jeter to a room on the second floor of the building. There, along with Wilson and Jerome Thomas, defendant and Jeter took some of the cocaine that they had purchased. A short time later defendant and Jeter left the room. In the hallway, Jeter and defendant got into an altercation during which Jeter took a fifty-dollar bill from defendant. Defendant knocked Jeter down and Jeter called out for help to Thomas. Thomas responded to Jeter's call for help and pushed defendant against the wall, holding a knife to his throat. Defendant shouted, "I'm coming back to burn this mother fucker down to kill you all." He then again said, "I'll be back to kill you mother fuckers and burn the building down." Jeter and Wilson left the building after defendant made these threats and Jerome Thomas eventually released his grip on defendant, who in turn left the building and returned home.
At home, defendant told co-defendant and others that he had been robbed. Defendant and co-defendant[1] then proceeded back to the rooming house at 501 21st Street. As they entered the dwelling through the front door at approximately 3:30 a.m., they rushed past Eunice Daniels, who was leaving the building. Ms. Daniels observed that defendant and co-defendant had angry looks on their faces and that defendant had one of his *106 hands under his jacket.[2] Ms. Daniels walked down the street after she left the building. When she was about one-half block away, defendant and co-defendant ran past her. Just after that, Ms. Daniels heard the sound of windows breaking and saw black smoke billowing out of the building. A few days after the fire, defendant approached Ms. Daniels and told her "whatever you do, don't say nothing because that was some serious shit."
In order to escape the inferno, about seventeen residents of the three story dwelling jumped from windows of their rooms. Many sustained serious injuries and required hospitalization. After the fire was extinguished, investigators discovered the charred body of Tyrone Pickett in the rubble. Several days later, while demolishing the remains of the structure, the burnt remains of an unidentified individual were found. The undisputed medical evidence presented by the State demonstrated the deaths of these two individuals were caused entirely by the fire.
Pursuant to an investigation of the fire, Joseph F. Lake of the New Jersey State Police Arson Unit concluded that the fire originated in the first floor stairwell of the building from a liquid accelerant, such as one gallon or less of gasoline, being poured and ignited by a match or lighter and producing a rapid and severe fire attack. Work boots seized from defendant's apartment tested positive for gasoline. All other clothing seized from the apartment tested negative. Specimens of charred wood flooring and charred baseboard wood taken from the right side of the front entrance of the building tested positive for gasoline. A specimen of charred wood and plaster *107 taken from the left side of the front stairwell also tested positive for gasoline.
Defendant testified at trial. He acknowledged that sometime after 3:00 a.m. on February 12, 1988, Michael Jeter introduced him to Artie Webster and that he purchased cocaine from him. According to defendant, both he and Jeter paid a couple of dollars toward a half vial of cocaine. Defendant admitted that he returned to a room on the second floor of the building at 501 21st Street with Jeter, Wilson and Thomas. According to defendant, he took a pinch of cocaine, determined that the drug was no good and decided to leave. Defendant asserted that when he left the room and started down the stairs Jeter followed him and dragged him back up the stairs. He grabbed Jeter and they struggled with each other. Jeter called out to Thomas for help, Thomas ran into the hallway with a knife in his hand, and held it next to defendant. While Thomas held the knife to defendant, Jeter removed a fifty-dollar bill from his pocket and then left; Thomas released defendant, they talked a little and defendant went home.
Defendant acknowledged that he returned to 501 21st Street shortly after the altercation, accompanied by co-defendant, his brother-in-law. Defendant stated that he got a knife from his house and brought it to the building. He admitted that he entered the rooming house, and that as he did so he passed Eunice Daniels. He said co-defendant left the area and he himself did not stay in the building when he heard scuffling and voices inside. When he left the rooming house, he heard a noise alongside of the building from the direction of a nearby alleyway. Minutes later he heard screaming and saw smoke. He denied that he had gasoline with him or that he started the fire.
On appeal, defendant raises the following points.
I. THE TRIAL COURT ERRED IN ALLOWING STATEMENTS OF THE DEFENDANT, AS THEY WERE THE PRODUCT OF CUSTODIAL INTERROGATION.

*108 II. THE TRIAL COURT'S INSTRUCTIONS TO THE JURY SERVED TO GREATLY PREJUDICE DEFENDANT THEREBY AFFECTING HIS RIGHT TO A FAIR TRIAL.
III. THE TRIAL COURT ERRED IN ADMITTING PHOTOGRAPHS OF DEAD BODIES AS THEIR PROBATIVE VALUE WAS SIGNIFICANTLY OUTWEIGHED BY THEIR INFLAMMATORY POTENTIAL.
IV. THE SENTENCE IMPOSED UPON THE DEFENDANT WAS MANIFESTLY EXCESSIVE AND MUST BE MODIFIED BY THE REVIEWING COURT.

I.
Defendant contends that the context in which he made statements to police after his arrest constituted custodial interrogation in violation of his right to counsel and to remain silent. He claims that the police questioned him and showed him pictures to elicit incriminating statements. He also claims he was ill at the time, had been handcuffed to a chair for 5 1/2 hours and was told by Sergeant Edgar, after his Miranda warnings, that he would get an attorney at arraignment.
Before police may initiate questioning, the accused must be informed of his constitutional rights, particularly his right to counsel and to remain silent, and the consequences of waiving those rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Custodial interrogation must cease upon even an equivocal indication of a desire to assert those constitutional rights. Id.; State v. Johnson, 120 N.J. 263, 281, 576 A.2d 834 (1990). The admissibility of statements made after the accused has asserted his rights depends on whether the police have "scrupulously honored" those rights by ceasing interrogation. Michigan v. Mosley, 423 U.S. 96, 102-03, 96 S.Ct. 321, 325-26, 46 L.Ed.2d 313, 320-21 (1975); State v. Fuller, 118 N.J. 75, 79, 570 A.2d 429 (1990). Where an accused asserts the right to counsel, all interrogation must cease until a lawyer has been provided.
Such interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest *109 and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297, 308 (1980). However, while police-initiated custodial interrogation may not be resumed without re-administering the Miranda warnings once a defendant has exercised the right to silence, State v. Hartley, 103 N.J. 252, 267, 511 A.2d 80 (1986), the same is not true of defendant-initiated conversations or spontaneous statements. State v. Fuller, 118 N.J. at 85, 570 A.2d 429.
A Rule 8 hearing was conducted to determine the admissibility of defendant's statements, Evid.R. 8(3), during which the following evidence was presented. On February 16, 1988, at 6:00 a.m., the police executed a search warrant for defendant's apartment. They seized clothing from that location and arrested defendant. After orally advising him of his rights under Miranda, the police transported defendant to the headquarters of the Irvington Police Department. At headquarters, Sergeant Edgar escorted defendant to his desk and handcuffed him to a chair. He then advised defendant of his Miranda rights utilizing a written Miranda form. Defendant acknowledged that he understood his rights, but indicated that he did not want to make a statement to the police. Accordingly, defendant refused to sign the waiver portion of the Miranda form. Sergeant Edgar wrote "refused" in the waiver portion of the form and then started to complete a "5A" form to determine defendant's eligibility for representation by a public defender. While Sergeant Edgar worked at completing the "5A" form, defendant advised him that he would not only help Sergeant Edgar fill out the form, but he would tell him everything he wanted to know if he could speak with an attorney. Sergeant Edgar told defendant that he would get an attorney at his arraignment. On hearing this, defendant again told Sergeant Edgar to get him an attorney and asserted that he would *110 tell everything, stating "I'm never going to walk the streets again, but I want to avoid the death penalty, if I can."
At the same time that he was promising to tell police everything, defendant saw pictures of Michael Jeter, Jerome Thomas and John Wilson, which were strewn across the Sergeant's desk along with numerous other items relating to the investigation of the fire. On seeing the pictures of Jeter, Thomas and Wilson, defendant said, "If you got them you got me" and again asked for an attorney. Defendant also commented "you must have found Eunice." During this time, defendant was not asked any questions except as to the "5A" form.
Pursuant to defendant's request, Roger Solomon of the Public Defender's Office appeared at the Detective Bureau at approximately 11:30 a.m. and spoke with defendant. Mr. Solomon informed police that defendant would not give them a statement and that he was ill. Mr. Solomon indicated that when he spoke with defendant he had complained of headache, chills and fever. Mr. Solomon also revealed that during his conversation with defendant at police headquarters, defendant had informed him that he had been questioned and the only reason he made the oral admissions to police was as a ploy to obtain a lawyer to intervene and assist him in getting medical treatment. According to Mr. Solomon, defendant stated that he knew how the police operated and that he wanted to make them think he was afraid of the death penalty and willing to cooperate, which would motivate the police to obtain counsel for him. Defendant also introduced hospital records indicating that he had a fever of 104.4 degrees and 102.2 degrees on the evening of February 15 and 16, 1988.
At the Miranda hearing, Judge Dios made the following findings of fact:
Let's get the fabled chicken and the fox appropriate, coops. When we talk about Mr. Menz showing up. Mr. Menz is the head of homicide. There had been a request made by Mr. Mujahid to see if there was something he could do so that he would not be charged as a capital offender. I assume that Mr. Menz was the appropriate person to call, but when we talk about having called Mr. *111 Menz,[3] we're talking about after the fact. The statements that have been testified to here as having been volunteered occurred before Mr. Menz and Mr. Solomon appeared on the scene. There is some argument on behalf of the defendant, Mr. Mujahid, that he was ill and could not have been in control of his senses. I find that rather strange in view of Mr. Roger Solomon's testimony. You will recall that Mr. Solomon testified that Mr. Mujahid told him that the only reason he made admissions was to get a lawyer. Indeed if what Mr. Solomon is testifying to is true, that's some very sophisticated thinking. It was not the thinking, you know, the tortured rattled brain, so I see no validity whatsoever that a claim of a hundred and three, a hundred and two fever, whatever it was, was what led to what are now being called extracted or excruciating utterances. I find the testimony of Sergeant Edgar and Sergeant O'Malley thoroughly credible. Where else would one who's working on a case, collecting a plether [sic] of evidence have it put [sic] on his desk? Perfectly normal situation. All the testimony has been that each of the defendants was read his Miranda rights and that no questions whatsoever were asked except in an attempt to fill out a 5A form in compliance with the request for the attorney made by Mr. Mujahid. The fact that a defendant saw pictures that were lying on a desk and was thereby stimulated by those pictures to make statements as to his involvement was an entirely voluntary thing, that there is no evidence of any pressure in this matter, that they were in any way forced to make the statements. From all I have heard, their rights were scrupulously defended. I find the statements to be voluntary and I will admit them if they were offered at the time of trial and I find that beyond a reasonable doubt.
There is sufficient credible evidence to support these findings. State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964). The officers testified that they did not question defendant after he asked for an attorney and that defendant was not shown any pictures. The materials on Sergeant Edgar's desk were there as part of his investigation duties, not there as a design to elicit a response. Compare State v. Ward, 240 N.J. Super. 412, 418-19, 573 A.2d 505 (App.Div. 1990) (unwarned defendant directly confronted in cellblock with photographs designed to elicit a statement in violation of Miranda). Testimony by defendant and Mr. Solomon admitted that defendant was intentionally making statements to the police of his own initiative as part of a design to obtain an attorney and medical attention. Moreover, we note at the time of his arrest, defendant had four *112 previous convictions and had served time in federal and state prisons. He was not a novice to the system and there is no evidence that he was not aware of the consequence of making statements to police. See State v. Cooper, 211 N.J. Super. 1, 22, 510 A.2d 681 (App.Div.), certif. denied, sub nom. State v. Lawson, 105 N.J. 525, 523 A.2d 168 (1986). Accordingly, Judge Dios' finding beyond a reasonable doubt that defendant's statements were spontaneous as well as voluntary and knowing is supported by sufficient credible evidence.

II.
Defendant contends the jury charge was deficient in several respects: (1) the charge failed to include a State v. Martin, 119 N.J. 2, 573 A.2d 1359 (1990) causation charge as to the murder and felony murder counts; (2) the flight charge failed to include instructions that if the jurors accepted defendant's explanation for leaving the building they could infer a lack of consciousness of guilt; (3) the charge failed to include aggravated manslaughter and/or passion/provocation manslaughter as lesser concluded offenses of the murder counts; and (4) a reinstruction on circumstantial evidence not requested by the jury was prejudicial.

a.
The jury charge on murder and felony murder substantially followed the model jury charge. It did not contain a special reference to causation. See N.J.S.A. 2C:2-3. In Martin, similarly involving murder and felony murder arising from arson, the same model jury charge was given. The failure to include a particular instruction on causation was found to have "a clear capacity to produce an unjust result." There, one person died in a fire in a three-story apartment building. Defendant admitted setting the fire by lighting a paper bag in a hallway with the purpose of "making a mess" but not intending it to spread. The State's theory was that the fire was set by spreading kerosene between the ground and second floor. Causation *113 was a critical issue with the State and defendant offering contrasting theories, each supported by expert testimony. Accordingly, the court held that the charge should have included an instruction that if the jury believed that the victim's death "occurred in a manner different from that designed or contemplated by defendant, it should decide whether her death was not too remote to have a just bearing on his liability." 119 N.J. at 16, 573 A.2d 1359. Because defendant had asserted various theories at trial as to how the fire spread as the result of unforseen and intervening causes, the Court stated that the above charge was necessary for the jury to properly consider the significance of defendant's version of the facts. Id. at 17, 573 A.2d 1359.
Unlike Martin, however, here the causal relationship between conduct and result was not disputed. The only theory presented was that gasoline was spread on the first floor and ignited with a match; defendant presented no conflicting theory, only complete denial. There was no question but that the deaths were the direct result of the deliberately set fire. Thus, the additional reference to N.J.S.A. 2C:2-3 was not necessary.
We, therefore, conclude the charge on murder and felony murder fairly and clearly explained the applicable law, State v. Green, 86 N.J. 281, 289-91, 430 A.2d 914 (1981). A reading of the charge in its entirety does not show prejudicial error. State v. Ramseur, 106 N.J. 123, 280, 524 A.2d 188 (1987).

b.
It is unclear which of the following two charges defendant requested at trial: aggravated manslaughter, or passion/provocation manslaughter. He initially requested a charge on aggravated manslaughter based on the evidence of "rage" and that defendant had a knife. The trial court responded, "The anger you're speaking about would be that of passion" and defense counsel responded affirmatively stating that he was talking about "reckless disregard." Judge Dios then denied the request stating that the offense took place "much later" after the *114 altercation and that he could not think of a more purposeful act than setting fire to the building. Passion/provocation manslaughter, appears then, to have been the lesser included charge requested. In any event, we will consider the claim that both should have been charged as if they had both been requested. The issue, thus, is whether there exists a rational factual basis for either aggravated manslaughter and/or passion/provocation manslaughter to have required the charges. State v. Sloane, 111 N.J. 293, 303, 544 A.2d 826 (1988); State v. Crisantos (Arriagas), 102 N.J. 265, 278, 508 A.2d 167 (1986). We think not.
A person commits aggravated manslaughter when he "recklessly causes death under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4(a). One acts recklessly "with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." N.J.S.A. 2C:2-2(b)(3). Purposeful murder evidences a conscious object or design to cause death or serious bodily injury resulting in death. N.J.S.A. 2C:2-2(b)(1); N.J.S.A. 2C:11-3(a)(1). Knowing murder occurs if defendant is aware that it is practically certain that his conduct will cause death or serious bodily injury resulting in death. N.J.S.A. 2C:2-2(b)(2); N.J.S.A. 2C:11-3(a)(2). Aggravated manslaughter, thus, differs from purposeful and knowing murder in that it requires a less culpable state of mind. Whereas purposeful murder requires proof that death was intended and knowing murder requires proof of awareness that death was practically certain to result, aggravated manslaughter requires only that the defendant acted recklessly and that the circumstances were such that death was a probability. See State v. Breakiron, 108 N.J. 591, 605, 532 A.2d 199 (1987); State v. Bishop, 225 N.J. Super. 596, 601, 543 A.2d 105 (App.Div. 1988); State v. Sanchez, 224 N.J. Super. 231, 240, 540 A.2d 201 (App.Div.), certif. denied 111 N.J. 653, 546 A.2d 561 (1988).
*115 The State's evidence in this case established that during an argument defendant had with three residents of the rooming house at about 3:00 a.m., defendant threatened to burn down the building and kill them all. He then went home and got co-defendant to help him. He returned about 30 minutes later with some gasoline, deliberately set the fire and then fled. Defendant's sole defense was that although he argued with Jeter and Thomas and returned to the boarding house, he did not set the fire.
As the trial court found, the evidence that defendant acted purposefully and knowingly is entirely overwhelming and there is no rational basis in the State's proofs to believe that defendant acted merely recklessly with extreme indifference to human life by "consciously disregard[ing]" a substantial and unjustifiable risk. N.J.S.A. 2C:2-2b(3). Rather, his awareness was such that it was "practically certain that his conduct [would cause the] result." N.J.S.A. 2C:2-2b(2). The evidence fairly reeks of this being a deliberately set fire under circumstances in which one had to either intend the sleeping inhabitants to die or be fully aware that would probably occur. We see no basis for aggravated manslaughter under these circumstances. See State v. Rose, 112 N.J. 454, 482-83, 548 A.2d 1058 (1988); State v. Crisantos (Arriagas), 102 N.J. at 275, 508 A.2d 167; State v. Hollander, 201 N.J. Super. 453, 475, 493 A.2d 563 (App.Div.), certif. denied 101 N.J. 335, 501 A.2d 983 (1985). Cf. State v. Pitts, 116 N.J. 580, 610-12, 562 A.2d 1320 (1989).
We reach a similar conclusion on the argument that passion/provocation manslaughter should have been charged. Originally grounded in common law, passion/provocation manslaughter is codified in N.J.S.A. 2C:11-4b(2). The statute defines passion/provocation manslaughter as "homicide which would otherwise be murder ... [that] is committed in the heat of passion resulting from a reasonable provocation." Thus, as described in State v. Crisantos (Arriagas):

*116 Voluntary manslaughter is a slaying committed in a transport of passion or heat of blood induced by an adequate provocation, provided the killing occurs before the passage of time sufficient for an ordinary person in like circumstances to cool off. [Id., 102 N.J. at 274, 508 A.2d 167].
Passion/provocation manslaughter was, at common law, a lesser included offense to murder and developed, as noted in Crisantos, as "a concession to the frailty of man, a recognition that the average person can understandably react violently to a sufficient wrong and hence some lesser punishment is appropriate." Id. at 274, 508 A.2d 167.
Four elements must exist for passion/provocation manslaughter to arise: (1) the provocation must be adequate, (2) there must not have been time for defendant to cool off between the provocation and the slaying, (3) defendant must have actually been impassioned by the provocation, and (4) defendant must not have actually cooled off before the slaying. State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990). The first two elements are objective, the latter two subjective.
As to the first, the provocation from an objective standard must be "sufficient to arouse the passions of an ordinary [person] beyond the power of his control." State v. King, 37 N.J. 285, 301-02, 181 A.2d 158 (1962). And the provocation must be sufficient enough so that the "`intentional homicide may be as much attributable to the extraordinary nature of the situation as to the moral depravity of the actor.'" State v. Mauricio, 117 N.J. at 412, 568 A.2d 879 (quoting Model Penal Code § 210.3, comment). Neither words alone, State v. Crisantos, 102 N.J. at 274, 508 A.2d 167, nor a bump and an insult, State v. King, 37 N.J. at 301-02, 181 A.2d 158, are sufficient. But as observed in State v. Mauricio:
Although there may be a trend away from "the usual practice of placing the various types of provocatory conduct into pigeonholes," LaFave & Scott, supra, § 7.10, at 256, battery, except for a light blow, has traditionally been considered, almost as a matter of law, to be sufficiently provocative. Ibid.; see also State v. Herrmann, supra, 77 N.J.L. [534] at 535 [76 A. 1086 (1909)] ("it would clearly be a jury question whether a blow in the face, either by fist or by open hand would not be sufficient to exclude murder").
[Id. 117 N.J. at 414, 568 A.2d 879].
*117 Here, we do not think the proofs rationally support a conclusion that defendant was so fueled and overcome by passion by his altercation with Jeter and Thomas that it could be said the "intentional homicide may be as much attributable to the extraordinary nature of the situation as to the moral depravity of the action." Id. Although Eunice Daniels testified that defendant had an angry look on his face when she saw him enter the building shortly before the fire, and about 30 minutes after the altercation, there was absolutely no evidence in the record to suggest that defendant was experiencing extreme emotional disturbance or passion when he returned to 501 21st Street before the fire. Significantly, before the torching, defendant had returned to his home, and talked to his brother-in-law. At trial he testified that when he re-entered the building and heard scuffling he decided to leave, realizing that it was not wise for him, a lone individual, to confront several individuals. Thus, by his own testimony, defendant had time to "cool off" and in fact did so.
We recognize State v. Mauricio, broadly read, could suggest that questions of sufficient provocation and cooling off should almost invariably be considered jury issues. We note, for instance, that in concluding the evidence in Mauricio was such that "it would not be idle to have the jury decide" passion/provocation, the court also acknowledged the existence of ample proof that defendant's homicidal conduct was "coolly calculated" and that "... smarting from the indignity visited upon him by the bouncer, he returned to his room, changed into garments that would conceal a weapon, and made his way back to the Lounge where he was again rebuffed; and that thereafter he lay in wait for his target to depart from the premises, whereupon he recovered the firearm from where he had secreted it under a parked vehicle and stalked his prey into the parking garage, where he gleefully and maliciously finished him off." Id. at 417, 568 A.2d 879. But as the court also observed, that was not the only version of what occurred.
*118 Here it is undisputed that at the time of the provoking event, i.e. the altercation with Thomas and Jeter, defendant did not have either gasoline or weapons. It is undisputed that he left the premises and went home where he spoke to his brother-in-law and, under the State's version obtained the gasoline, or under defendant's version got a knife. About 30 minutes later he returned. The fire unquestionably was then deliberately set.
We think these circumstances are closer to those in State v. Crisantos than Mauricio. In Crisantos, a 54 year-old unemployed, inebriated victim was robbed and murdered on his way home. The State's evidence showed that defendant and another person attacked the victim, disabled him by breaking his ankle and then robbed him. When someone approached, they hid nearby. After the person left to call the police, they jumped on top of the victim stabbing him repeatedly. The defendant's version was that the victim instigated a fight by calling them names and ethnic epithets and then initiated a physical altercation during which he was stabbed. Characterizing this version as conveying a "gross mismatch, an older inebriated man against two younger men, at least one armed with a knife," the court found no evidence of passion or extreme emotional disturbance.
The deliberate torching of a wood frame, three-story rooming house inhabited by 20 sleeping people at 3:30 a.m. is just as much a "gross mismatch." The altercation some 30 minutes earlier with only two of the numerous residents is just as insubstantial in proportion to the criminal act charged here as the ethnic slurs and attempted striking in Crisantos. They do not present a rational basis for passion or extreme emotional disturbance. See State v. Lewis, 223 N.J. Super. 145, 151, 538 A.2d 399 (App.Div.), certif. denied 111 N.J. 584, 546 A.2d 510 (1988); State v. Hollander, 201 N.J. Super. at 475, 493 A.2d 563. Cf. State v. Micheliche, 220 N.J. Super. 532, 543, 533 A.2d 41 (App.Div.), certif. denied 109 N.J. 40, 532 A.2d 1108 (1987).
*119 Finally, we note that even if passion/provocation and aggravated manslaughter should have been charged, there would remain a substantial issue as to whether failure to do so would be harmless given the convictions on the felony murder counts based upon arson. Neither aggravated manslaughter nor passion/provocation manslaughter are lesser included offenses of the particular felony murder convictions here. Cf. State v. Boyer, 221 N.J. Super. 387, 401, 534 A.2d 744 (App.Div. 1987), certif. denied 110 N.J. 299, 540 A.2d 1280 (1988); State v. Vujosevic, 198 N.J. Super. 435, 444-45, 487 A.2d 751 (App.Div.), certif. denied 101 N.J. 247, 501 A.2d 920 (1985). See also State v. Lewis, 223 N.J. Super. at 151, 538 A.2d 399. But see State v. Grunow, 102 N.J. 133, 146-47, 506 A.2d 708 (1986) (error in passion/provocation charge not harmless where purposeful or knowing murder and aggravated manslaughter are involved but not an unrelated felony murder); State v. Crisantos (failure to give passion/provocation manslaughter charge not harmless error where charges are robbery and felony murder based upon death during course of robbery, but consideration of harmless error issue dicta since passion/provocation was found to be unwarranted on the evidence).

c.
We have carefully considered defendant's remaining claims as to the charge and find them to be clearly without merit. R. 2:11-3(e)(2).

III.
Defendant contends that his consecutive sentences violate the consecutive sentence guidelines set forth in State v. Yarbough, 100 N.J. 627, 498 A.2d 1239 (1985), cert. denied 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986). The criteria for imposition of consecutive sentences are outlined in Yarbough 100 N.J. at 643-644, 498 A.2d 1239. They include whether the crimes involved multiple victims, and the nature and circumstances of the offenses. Id. at 644, 498 A.2d 1239. *120 The sentences normally should not exceed the sum of the longest terms that could be imposed for the two most serious offenses, id., but, "there are cases so extreme and so extraordinary that deviation from the guidelines may be called for." Id. at 647, 498 A.2d 1239.
Defendant's aggregate sentence totalled two life terms plus 40 years with 80 years parole ineligibility. The sum of the maximum terms that could be imposed for the two most serious offenses, two counts of purposeful and knowing murder, is two life terms with 60 years parole ineligibility. N.J.S.A. 2C:11-3(b). Accordingly, defendant's sentence exceeds the outer limit. However, the circumstances of this case, starting a fire at a rooming house at 3:30 a.m., when families are likely to be sleeping, resulting in two deaths, multiple serious injuries, and the devastation of homes and personal belongings, constituted an "extraordinary" case and justified consecutive sentences. See State v. Craig, 237 N.J. Super. 407, 417, 568 A.2d 100 (App.Div. 1989), certif. denied, 121 N.J. 662, 583 A.2d 348 (1990); State v. Lewis, 223 N.J. Super. 145, 153-54, 538 A.2d 399 (App.Div.), certif. denied, 111 N.J. 584, 546 A.2d 510 (1988). "[T]he murders of multiple victims represents an especially suitable circumstance for the imposition of consecutive sentences." State v. Russo, 243 N.J. Super. 383, 413, 579 A.2d 834 (App.Div. 1990), certif. denied, 126 N.J. 322, 598 A.2d 882 (1991). As the trial court said in sentencing defendant:
Let me note that the crimes and their objectives in this case were predominantly independent of each other. You sought revenge on someone and cared not for all of the innocent who lay secure in their beds that night. There was a vast number of victims and the convictions are so numerous as to revolt the soul of mankind.
We find no abuse of discretion in the consecutive sentences here. See State v. Craig, 237 N.J. Super. 407, 568 A.2d 100; State v. Lewis, 223 N.J. Super. 145, 538 A.2d 399.
Moreover, we reject defendant's contention that the trial court did not apply and weigh the aggravating and mitigating circumstances set forth in N.J.S.A. 2C:44-1(a) and (b) in *121 imposing the maximum terms and periods of parole ineligibility. The trial court fully stated his reasons for the sentences at the sentencing hearing. He said:
There is clearly, clearly, the most serious risk that you will commit other offenses. The nature, the circumstances of the offense and its heinous, cruel, and depraved characteristics were obvious to all of the jurors. There is a need to deter you and others from violating the law, of course and justice would indeed be a sham as you characterize justice to be if our judicial system was not concerned with society.
........
... frequently I hear from some members of the defense Bar when they're representing clients on drug offenses that their clients are only guilty of victimless crimes and, clearly, your convictions had its genesis in the use of and trafficking of drugs resulting in the creation of 22 separate and distinct victims, many of whom sustained severe and grievous injury.
........
As well as the sacrifice of two lives not to the God you speak about 
........
But to the Mullock of your addiction. Men, women and children were sacrificed to your addiction. People who had not offended you in any way.
........
And you unremorsefully created a funeral parlor without regard of who should live or die, you with your immorality, your savage and outrageous and brutal nature, and you lead and have led this Court to the conclusion that the words you uttered to the police on the night of your arrest, "I know I'm never going to walk the street again" were indeed prophetic.
Society must never again be threatened by your ferile [sic] presence, the possibility of wholesale slaughter revolts all but the most callous minds.
........
There's not the slightest possibility of rehabilitation as far as you're concerned and incapacitation remains as the only reasonable and human response for society to be free of your horror....
These findings plainly correspond to N.J.S.A. 2C:44-1(a)(1), (2), (3), (6) and (9). Implicitly the trial court found no mitigating circumstances. It is, moreover, evident from his findings that Judge Dios was clearly convinced that the aggravating factors preponderated and substantially outweighed any mitigating. See State v. McBride, 211 N.J. Super. 699, 705, 512 A.2d 583 (App.Div. 1986); State v. Porter, 210 N.J. Super. 383, 396-97, *122 510 A.2d 49 (App.Div.), certif. denied, 105 N.J. 556, 523 A.2d 191 (1986). The trial court reached a conclusion that could be reasonably made upon a weighing of the relevant factors. State v. Roth, 95 N.J. 334, 366, 471 A.2d 370 (1984). In our judgment, the sentences were neither manifestly excessive nor unduly punitive and they do not shock the judicial conscience. See State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989); State v. Ghertler, 114 N.J. 383, 387-88, 393, 555 A.2d 553 (1989).

IV.
We have carefully considered defendant's remaining claim set forth in Point III of his brief. We are convinced it is clearly without merit. R. 2:11-3(e)(2).
The judgment of conviction and order for commitment are, thus, affirmed.
NOTES
[1] A separate opinion affirming the conviction of co-defendant Richardson is being filed today (A-3333-88T4).
[2] During her testimony, Ms. Daniels told the jury defendant had his hands up to his jacket "like this" and demonstrated for the jury what she actually saw. The record does not contain a description of that demonstration. However, in opening, the prosecutor told the jury that Ms. Daniels would testify that "he was sort of hiding something under his arm."
[3] At the time of defendant's arrest, Howard Menz, an attorney, was head of the Homicide Unit of the Essex County Prosecutor's Office. When defendant requested an attorney, Mr. Menz was initially contacted.