967 F.2d 877
 George GESCHWENDT, Appellant,
v.
Joseph M. RYAN, Superintendent (Warden); and the Attorney
General of the State of Pennsylvania: Ernest
Preate; and the District Attorney of
Bucks County.
 No. 91-1244.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 5, 1991.
Reargued May 6, 1992.
Decided June 18, 1992.
 
 Elizabeth K. Ainslie (argued), Philadelphia, Pa., for appellant.
 Stephen B. Harris (argued), Chief of Appeals, Office of Dist. Atty., Doylestown, Pa., for appellee.
 Argued Sept. 5, 1991
 Before: STAPLETON, GREENBERG and ALDISERT, Circuit Judges.
 Reargued May 6, 1992
 Before: SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 George Geschwendt, who is serving life imprisonment for six first degree state murder convictions, appeals from a judgment of the district court entered on March 21, 1991, denying his petition for habeas corpus. We will affirm.
 
 I. BACKGROUND
 
 2
 We will only summarize the facts as developed at the trial in the Court of Common Pleas in Bucks County, Pennsylvania, for they are not in dispute and are set forth in the opinion of the Supreme Court of Pennsylvania on Geschwendt's direct appeal from his conviction. See Commonwealth v. Geschwendt, 500 Pa. 120, 123-24, 454 A.2d 991, 992-93 (1982). Prior to March 12, 1976, Geschwendt purchased a .22 caliber gun and falsely reported to the local police that it was stolen on the day of the purchase. Geschwendt at that time resided with his mother and brother in Bensalem Township directly across the street from a residence occupied by the Abt family. On March 12, 1976, after his brother and mother had gone to work, Geschwendt broke into the Abt's empty home. Geschwendt waited for the Abts to return and, as they did so, using the gun he had reported stolen, he shot and killed five of them, as well as a boyfriend of one of the victims. Geschwendt had intended to kill the entire family, but he left before he completed his mission, because he was alarmed by the constant ringing of the telephone. While Geschwendt attempted to conceal his role in the killings by disposing of his clothes and the gun, when questioned he gave a complete confession which he has never repudiated.
 
 
 3
 Geschwendt was indicted for six first degree murders. The case was tried to a jury in two stages: a culpability stage to determine the offenses, if any, Geschwendt had committed, followed by a penalty phase. As Geschwendt indicates in his brief, "[t]he defense was insanity," for he did not deny committing the homicides. Thus, with the use of expert testimony, he attempted to establish that he was insane. However, the Commonwealth countered with expert testimony that Geschwendt was sane. Following the completion of the evidence on the first phase, the court defined the elements of first degree murder, including the specific intent to take life required, and instructed the jury that Geschwendt could be convicted of that offense if the Commonwealth proved beyond a reasonable doubt that the elements had been satisfied. The court also instructed the jury that it could convict Geschwendt of third degree murder if he suffered from a mental defect rendering him incapable of forming the requisite intent for first degree murder. Furthermore it charged the jury it could convict Geschwendt of voluntary manslaughter.[1] In accordance with Pennsylvania procedure, the judge told the jury that if it found Geschwendt guilty of first degree murder, it would deliberate again to decide whether to sentence him to life imprisonment or death. Of course, the court also instructed the jury that Geschwendt could be found not guilty.
 
 
 4
 The court gave detailed instructions on the insanity defense, telling the jury five times that the Commonwealth bore the burden of proving Geschwendt guilty beyond a reasonable doubt, three times that the Commonwealth bore the burden of proving Geschwendt sane beyond a reasonable doubt, and three times that, if the Commonwealth failed to prove Geschwendt sane beyond a reasonable doubt, the jury should find him not guilty. At trial Geschwendt did not assert that the court erred in its formulation of either the substantive law or the burden of proof on the insanity defense and he still makes no such claim. Nevertheless, he objected to the charge as the jury could find him not guilty only by returning a general verdict, whereas he urged that he was entitled to a charge that the jury could return a specific verdict of not guilty by reason of insanity. The trial court refused to give the specific verdict charge, and Geschwendt was convicted of six counts of first degree murder.
 
 
 5
 The case next turned to the penalty phase. At that stage, the court instructed the jury that, if it found that the first degree murders were accompanied by at least one aggravating circumstance, and no mitigating circumstance, it was obliged to sentence Geschwendt to death, but otherwise the sentence would be life imprisonment. The court explained that the Commonwealth could demonstrate that there was an aggravating circumstance by proving beyond a reasonable doubt that Geschwendt broke into the house with the intent to commit murder. On the other hand, the court stated that if Geschwendt formed that intent after he entered, then the Commonwealth would not have proven that there was an aggravating circumstance.
 
 
 6
 The court also reminded the jury that Geschwendt, who was 24 years old at the time of the murders, urged that his mental age and lack of maturity constituted a mitigating circumstance, and it noted that Geschwendt had presented evidence on this point from a Dr. Strochak. It then told the jury that, if Geschwendt established by a preponderance of the evidence that he "lacked maturity, was young mentally insofar as his age was concerned, you have then determined that a mitigating circumstance exists, and if you so determine, then the punishment must be life imprisonment."
 
 
 7
 The court then reiterated that, if the jury found one aggravating circumstance but no mitigating circumstance, the sentence would be death, but if it did not find an aggravating circumstance, or if it found a mitigating circumstance, then the sentence was to be life imprisonment. During the deliberations, the court, in response to a question from the jury, instructed it that, if there was a mitigating circumstance, the sentence was to be life imprisonment even if there was an aggravating circumstance. The jury returned six death penalty verdicts.
 
 
 8
 The punishment, however, was not carried out, for after Geschwendt's trial the Supreme Court of Pennsylvania invalidated the death penalty in Commonwealth v. Moody, 476 Pa. 223, 382 A.2d 442 (1977), cert. denied, 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978). Accordingly, Geschwendt was resentenced to life imprisonment. Thereafter, the Superior Court of Pennsylvania, and then the Supreme Court of Pennsylvania, in a divided decision, affirmed Geschwendt's conviction and the modified sentence on direct appeal. Commonwealth v. Geschwendt, 500 Pa. 120, 454 A.2d 991 (1982).[2] A three-justice plurality in the Supreme Court believed that Geschwendt's principal issue on the appeal was his challenge to the trial court's refusal to charge the jury that a verdict of not guilty by reason of insanity might lead to his psychiatric treatment and commitment. It rejected his argument, reasoning that while Commonwealth v. Mulgrew, 475 Pa. 271, 380 A.2d 349 (1977), had changed the law after Geschwendt's trial so that such a charge would thereafter be given, the change was not retroactive and thus did not apply in his case.[3] In Mulgrew the court held that "when insanity is raised as a possible defense to criminal charges, a jury must be instructed concerning the possible psychiatric treatment and commitment of the defendant after the return of a verdict of not guilty by reason of insanity." 475 Pa. at 277-78, 380 A.2d at 352. Geschwendt does not now question the holding on his direct appeal that Mulgrew was inapplicable in his case.[4]
 
 
 9
 The Supreme Court of Pennsylvania, in the plurality opinion, indicated that the issue which is raised on this appeal, that the trial court erred in not instructing the jury that it could return a verdict of not guilty by reason of insanity, had not been properly preserved. Nevertheless, it dealt with and rejected this contention on the merits, as it held that it was not "supported by the record when the charge is viewed as a whole." Commonwealth v. Geschwendt, 500 Pa. at 135 n. 8, 454 A.2d at 999 n. 8. Three justices dissented on the ground that Geschwendt had been entitled to a specific charge that he could be found not guilty by reason of insanity, as they concluded that there had been a requirement in Pennsylvania since 1860 that when sanity is in issue the jury be allowed to return a specific verdict of not guilty by reason of insanity. 500 Pa. at 138, 454 A.2d at 1001. Furthermore they maintained that Mulgrew should be applied in Geschwendt's case. The seventh justice concurred without opinion in the result reached by the plurality.
 
 
 10
 Subsequently, Geschwendt filed a petition for habeas corpus in the district court, arguing that his due process rights had been violated by the trial court's refusal to charge the jury that he could be found not guilty by reason of insanity.[5] Following the appointment of counsel, Geschwendt moved to amend his petition to include a contention that his counsel was ineffective on his direct appeal, as that counsel had failed to assert that the trial court erred in its "refusal to give the jury an instruction that would have informed it of its right to return a verdict of not guilty by reason of insanity." The matter was referred to a magistrate judge who filed a report dated February 4, 1991, recommending that the court grant Geschwendt habeas relief because Pennsylvania law at the time of Geschwendt's trial required that the trial court instruct the jury that it could return a verdict of not guilty by reason of insanity. The magistrate judge reasoned that the court's refusal to provide this instruction violated Geschwendt's right to due process of law under the United States Constitution. While the magistrate judge mentioned the motion to amend the petition in her report and recommendation, she did not consider the ineffective counsel argument on the merits and did not act on the motion.
 
 
 11
 The district court rejected the recommendation, as it held that it was not the practice in Pennsylvania to instruct a jury that it had the option to return a specific verdict of not guilty by reason of insanity until after the decision in Mulgrew.[6] Inasmuch as Mulgrew had been decided after Geschwendt's trial, the district court determined that he had not been denied due process of law. The court also pointed out that it was "a telling point that the jury returned a verdict of death on the same day it found him guilty." It then asked, rhetorically, "[i]s it conceivable that a jury that was prepared to accept Geschwendt's insanity defense but felt themselves 'barred' and 'powerless' to do so based on the trial judge's charge, would nevertheless proceed to render six verdicts of death on the very same day they deliberated his guilt?" The district court did not address the ineffective counsel argument.[7]
 
 
 12
 On this appeal, Geschwendt urges that he was deprived of his liberty without due process of law because the trial court did not charge the jury that it could find him not guilty by reason of insanity. In this regard, he relies on Pa.Stat.Ann. tit. 50, § 4413 (Purdon 1969), and the dissent in the Supreme Court of Pennsylvania on his direct appeal. He further contends that his attorney on the direct appeal was ineffective for failing to preserve and argue the contention that the trial judge erred in not informing the jury that it could return a verdict of not guilty by reason of insanity.
 
 II. DISCUSSION
 A. The Charge to the Jury
 1. The Substance of the Charge
 
 13
 We deal first with the trial court's refusal to charge that the jury could return a verdict of not guilty by reason of insanity.[8] It is surprising that at the time of Geschwendt's trial there was still some question as to whether the jury had to be charged that when sanity was in issue it could return such a verdict. But the experienced Pennsylvania federal district court in this case did not think it was required, and thus the trial court's view of the law was not unique. The district court explained that the instruction that a jury could return a verdict of not guilty by reason of insanity "did not become standard practice until after the Mulgrew decision in 1977" so that at "the time of Geschwendt's trial, trial judges were not obligated to specifically instruct a jury on this option." There is a certain logic in this, for, until Mulgrew, it was not necessary to tell the jury of the consequence of a verdict of not guilty by reason of insanity. Thus, arguably, when Geschwendt was tried it was not important for the jury to be able to return a special verdict of not guilty by reason of insanity, as it could have only speculated on the consequences of that verdict.[9]
 
 
 14
 Nevertheless, we will assume without deciding that the charge was required by state law. But this assumption does not help Geschwendt, for, when the charge is examined and is considered in conjunction with the undisputed facts, it is clear that the only way that a verdict of not guilty could have been conceivably returned would have been if the jury concluded that the Commonwealth did not prove Geschwendt to be sane. As the Supreme Court of Pennsylvania said, "[t]he facts surrounding the murders were not disputed." 500 Pa. at 123, 454 A.2d at 992. Indeed, the magistrate judge, though recommending that the petition be granted, observed "[n]o jury could have reasonably found [Geschwendt] not guilty of committing ... the physical acts." Furthermore, Geschwendt himself concedes in his brief that the "defense was insanity."
 
 
 15
 It is therefore apparent that the plurality opinion of the Supreme Court of Pennsylvania simply recognized that a general verdict of not guilty would have been tantamount to a verdict of not guilty by reason of insanity. In fact, the situation was so clear that the Superior Court simply said that the jury was instructed that it could convict Geschwendt of first degree murder or find him "not guilty by reason of insanity." Commonwealth v. Geschwendt, 271 Pa.Super. 102, 105, 412 A.2d 595, 597 (1979). Overall, we have no reason to reject the conclusion of the Supreme Court of Pennsylvania that, when the instructions are viewed as a whole, the trial court did instruct the jury that it could find Geschwendt not guilty by reason of insanity. Thus, the court offered the jury the opportunity to return a de facto verdict of not guilty by reason of insanity.
 
 
 16
 We acknowledge that the Supreme Court of Pennsylvania under state law could have ordered a new trial because the jury was not given an explicit opportunity to return a de jure verdict of not guilty by reason of insanity. But our power in this habeas corpus proceeding is not so broad, for we may order the discharge of a state prisoner on the basis of defective jury instructions only if his or her fundamental due process rights have been violated. See Cupp v. Naughten, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). Here the only possible basis to contend that the error of state law rose to the level of a due process violation would be that the jury might have guessed that a general not guilty verdict, but not a special verdict of not guilty by reason of insanity, would have caused Geschwendt to be released and that the jury would have been reluctant to have that happen. But there is no basis for such a conclusion, as we are confident that in this case the jury would have recognized that the reason for a not guilty verdict could not have been misunderstood.
 
 2. Schad v. Arizona
 
 17
 We next turn to Schad v. Arizona, --- U.S. ----, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), which controls the outcome of this appeal even if the plurality of the Supreme Court of Pennsylvania was wrong with respect to the meaning of the charge as a whole and even if we are also incorrect in our conclusion that Geschwendt's due process rights were not violated by the form of the verdict. Thus, in considering Schad, we will treat the charge as though it did not, even when viewed as a whole, provide the jury with a not guilty by reason of insanity option.
 
 
 18
 Schad was indicted in Arizona for first degree murder under a traditional statutory formulation defining that offense as either premeditated murder or felony murder. Inasmuch as the murder apparently arose from a robbery, Schad viewed the evidence as supporting a finding that he was only the robber and not the murderer, and he therefore requested a lesser included offense charge on robbery. Id. at 2504.[10] While the trial court declined to give that charge, it did give a second degree murder charge, as a lesser included offense. Accordingly, the jury there had three choices of verdict, as it could have convicted Schad of first or second degree murder or found him not guilty. It convicted him of first degree murder and the court sentenced him to death. The Supreme Court of Arizona affirmed the conviction but the Supreme Court of the United States granted certiorari.
 
 
 19
 The Supreme Court rejected Schad's contention that the trial court's refusal to instruct on the possibility of a robbery conviction was inconsistent with Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).[11] The Court in Schad indicated that in Beck it had invalidated an Alabama statute prohibiting lesser included offense instructions in capital cases because it was concerned "that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." 111 S.Ct. at 2504. It pointed out that in Beck it had "repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented," but that concern was not present in Schad because Schad's jury did not have an all-or-nothing choice. Id. at 2505. Rather, Schad's jury had a third option other than guilty of first degree murder or not guilty, namely second degree murder. Hence the Court held that the first degree verdict was reliable even though on one view of the evidence, Schad may have been guilty of robbery but not of the homicide.[12] In discussing Schad's argument that the jury might have thought him guilty of robbery, though not of murder, but nevertheless convicted him of first degree murder, the Court explained:
 
 
 20
 To accept the contention advanced by [Schad] and the dissent, we would have to assume that a jury unconvinced that [Schad] was guilty of either capital or second-degree murder, but loath to acquit him completely (because it was convinced he was guilty of robbery), might choose capital murder rather than second-degree murder as its means of keeping him off the streets. Because we can see no basis to assume such irrationality, we are satisfied that the second degree murder instruction in this case sufficed to ensure the verdict's reliability.
 
 
 21
 Id. (emphasis added).
 
 
 22
 Schad, of course, did not announce a new principle of law, for it was and is consistent with the great weight of state authority. See State v. Mendez, 252 N.J.Super. 155, 165-66, 599 A.2d 565, 570-71 (App.Div.1991) (collecting cases). Schad teaches us that, in cases involving offenses on a ladder, if the trial court wrongfully refuses to charge the offense at the bottom rung, that error is harmless provided the jury returns a guilty verdict for an offense higher up rather than for an intermediate offense which was also charged.
 
 
 23
 There is simply no escape here from the principle underlying Schad. In Schad, the trial court refused to give an instruction, supported by the evidence, that would have permitted the jury to return a verdict for a lesser included offense. But the Supreme Court held that the first degree murder verdict was reliable because the jury had not returned a verdict for the intermediate offense of second degree murder.[13] Here, even assuming that the jury had not been given the option of returning a verdict of not guilty by reason of insanity, its guilty verdict is similarly reliable because the jury did not return a guilty verdict for either of the lesser included offenses, third degree murder or voluntary manslaughter.[14] Just as the intermediate charge on second degree murder destroyed Schad's argument, the lesser included offense charges on third degree murder and voluntary manslaughter foreclose Geschwendt's due process claim. While we recognize that Schad was concerned with a failure to charge a lesser included offense and we deal here with a refusal to charge on an alternative form of a jury verdict of not guilty, that does not matter. As an inferior court, we are bound to follow both the "reasoning and [the] result" in Schad, and the reasoning controls here. Planned Parenthood v. Casey, 947 F.2d 682, 692 (3d Cir.1991), cert. granted, --- U.S. ----, 112 S.Ct. 931, 117 L.Ed.2d 104 (1992).
 
 
 24
 We are, of course, aware that, in Schad, the Court indicated that it did not suggest that "Beck would be satisfied by instructing the jury on just any lesser included offense, even one without any support in the evidence." 111 S.Ct. at 2505. Beck was satisfied in Schad because Schad conceded "that the evidence would have supported a second-degree murder conviction." Id.
 
 
 25
 Here the trial court charged the jury on third degree murder as follows:
 
 
 26
 Now, if you conclude that the Commonwealth has sustained its burden of proof and has demonstrated by the degree of proof required that the defendant was sane at the time the crimes were committed, and you find that he did commit such crimes and in such degree as you may determine, you still have an additional problem. This problem, however, only arises and comes into play if you have previously concluded that the defendant was guilty of first degree murder.
 
 
 27
 You will recall that I told you earlier that the main distinction between murder in the first degree and that of third degree lies in the specific intent to take life being required in the former. Such intent to take life supplies the quality of wilfulness, deliberation and premeditation, otherwise essential to murder in the first degree. If you conclude that the defendant did not possess the capacity to form this specific intent to take life, due to a mental defect or disease, that is to say, that he did not possess the capacity to enter into a deliberately premeditated killing, then for those reasons you would not be justified and could not return a conviction of murder in the first degree against him for there would be no rhyme or reason, no logical escape from a proposition that a person cannot be guilty of wilful, deliberate and premeditated killing when he did not act deliberate [sic], premeditated and was not wilful for he was incapable of mentally doing so. If you find that he did not possess sufficient mental capacity to form this specific intent to kill, but nevertheless the killing did result from his act, and he was sane, then this inability to form such an intent would reduce the killing from first degree murder to third degree murder, and that should be your verdict.
 
 
 28
 This, again, is for the reason that the Commonwealth must prove beyond a reasonable doubt that the defendant possessed the mental capacity to form the required intent to kill as is required for first degree murder. On this problem, namely, whether the defendant possessed a mind capable of forming the specific intent to kill, as with the defense of insanity, you should as I have just told you look to and at all of the testimony both of lay witnesses and expert witnesses and from that testimony make your determination as to whether George Geschwendt was sane, and if so, was he capable of forming the intent which we have just outlined.
 
 
 29
 App. at 108-10 (emphasis added).
 
 
 30
 This charge was obviously somewhat different from the charge on insanity which provided that a defendant is insane "if at the time of committing any act he is, as a result of mental disease or defect, unable to understand the nature and quality of his act or to distinguish between right and wrong with respect to that act." Yet the third degree murder charge given here is similar to the insanity charge in the most fundamental way: the third degree murder charge diminishes criminal responsibility for a lack of specific mental intent, just as the insanity charge can excuse criminal conduct for an inability to form the specific mental intent. Furthermore, the court told the jury that the lack of capacity it was to consider was related to mental defect or disease, the very conditions involved in the insanity defense.
 
 
 31
 Our result cannot be avoided by an argument that, notwithstanding the court's charge to the jury which, as a legal matter, made a third degree conviction possible, such a conviction could not be justified by the evidence. The evidence of insanity which Geschwendt himself produced could have supported a finding by the jury that Geschwendt did not have the intent for a first degree conviction. As the district court pointed out in its opinion, Dr. Watson, a psychiatrist, testified that Geschwendt "did not know the nature or quality of his acts in the normal sense." Indeed, Geschwendt admits in his brief that he produced testimony "of two psychiatrists who examined [him] that at the time of the crime he did not know the difference between right and wrong and did not understand the nature and consequences of his acts." It would defy logic to hold that the jury could not have used this evidence to reach a conclusion that Geschwendt had diminished capacity and was therefore guilty of third degree murder.
 
 
 32
 We reiterate that the judge instructed the jury that if Geschwendt "did not possess the capacity to form this specific intent to take life, due to a mental defect or disease" but was sane and was otherwise guilty of first degree murder, it should convict him of third degree murder. We have no doubt that evidence of insanity, going to whether Geschwendt was able "to understand the nature and quality of his act or to distinguish between right or wrong with respect to that act," could have been used by the jury to conclude that Geschwendt lacked the ability to form a specific intent to take life. Therefore, it was entirely appropriate that the trial court charged the jury to consider on the diminished capacity issue the very evidence that was presented on the sanity issue. Thus, it is not surprising that neither the Commonwealth nor Geschwendt objected to the jury being charged on third degree murder, and that charge was properly given in this case.[15]
 
 
 33
 We recognize that it could be argued that the jury, by returning a first degree murder conviction and thus rejecting the insanity defense, necessarily rejected a diminished capacity defense so that a third degree verdict was no longer a viable option. But this contention would not undercut our result, because Geschwendt's position that he was prejudiced by the trial court's failure to charge that the jury could find him not guilty by reason of insanity assumes that it is possible that it would have returned such a verdict if it had been able to do so. If, as we have no doubt is the case, the jury found Geschwendt was guilty because he was sane, then, of course, he was not prejudiced by the absence of the alternative verdict. On the other hand, if the jury did not find that he was sane but nevertheless convicted him, then it did not reject the evidence that Geschwendt was insane and it then could have used that evidence to support a diminished capacity verdict.
 
 
 34
 It is evident, therefore, that the third degree murder charge supplied a perfect option for the jury to return a guilty verdict for a lesser included offense if it thought that the Commonwealth had not established that Geschwendt was sane but it did not want to acquit him and risk seeing him go free. Yet it returned six verdicts of first degree murder. We think that it would be irrational to believe, if the jury would have found Geschwendt not guilty by reason of insanity if given that explicit choice, that same jury would reject a third degree murder verdict under the above charge and instead return a first degree murder verdict.
 
 
 35
 There is yet another factor that validates the verdict for the jury, in addition to finding Geschwendt guilty of the most severe offense available, sentenced him to die six times, thus rejecting a sentence of life imprisonment. Certainly if the jury thought that Geschwendt was insane and would have returned a verdict of not guilty by reason of insanity if such a verdict had been available, but would not find him not guilty because it feared he would be released, it would have sentenced Geschwendt to imprisonment for life rather than condemn him to die. It cannot reasonably be argued that the jury would have thought that a sentence of life imprisonment could somehow be tantamount to a direction for Geschwendt's release, so that it would have been reluctant to return a verdict for that punishment. As we have already explained, the jury could not sentence Geschwendt to death unless it found an aggravating circumstance and did not find a mitigating circumstance. While it is not difficult, based on the record, to understand how the jury was able to find an aggravating circumstance, though it was not compelled to do so, it is also clear that it could easily have found a mitigating circumstance.[16] Accordingly, this case is a far stronger one for a harmless error analysis than Schad because in Schad the court and not the jury fixed the death penalty. See State v. Schad, 163 Ariz. 411, 788 P.2d 1162 (1989). Thus, in contrast to the situation in Schad, the penalty imposed further validates the verdict rendered.[17]
 
 
 36
 The district court in its opinion, rendered before Schad, was exactly right when it said:
 
 
 37
 It is a telling point that the jury returned a verdict of death on the same day it found him guilty. Is it conceivable that a jury that was prepared to accept Geschwendt's insanity defense but felt themselves 'barred' and 'powerless' to do so based on the trial judge's charge, would nevertheless proceed to render six verdicts of death on the very same day they deliberated his guilt?
 
 
 38
 App. at 82.
 
 
 39
 Of course, it is not conceivable. While Geschwendt in his brief points out quite correctly that the district court gave no "authority for the proposition that a jury would never vote to execute a man they believed to have been insane at the time of the murders he committed," that statement misses the point. The issue is not whether the jury would send an insane defendant to his death, for it is possible that a jury might disregard its instructions and do exactly that. The actual issue is whether a jury which would have returned a verdict of not guilty by reason of insanity if it could have done so would, when denied that option, vote to have an insane man executed rather than sentence him to life imprisonment or convict him of a noncapital offense. This question cannot be reasonably answered affirmatively.[18]
 
 
 40
 Why then did this jury find Geschwendt guilty of six murders in the first degree and sentence him to die six times? The answer is obvious. It found that the Commonwealth had established beyond a reasonable doubt that Geschwendt was sane. There is no doubt that Geschwendt committed a carefully planned, calculated mass homicide which he attempted to conceal both before and after the fact. The facts demonstrate that he understood what he was doing and knew it was wrong. It is no wonder that the jury rejected the insanity defense.
 
 3. State as Opposed to Federal Law
 
 41
 There is a third independent reason, perhaps even more fundamental than the first two, why the writ cannot be granted in this case. Again we assume that the plurality of the Supreme Court of Pennsylvania was wrong and that the charge as a whole did not give the jury the option to return a verdict of not guilty by reason of insanity. Furthermore, we assume that our first two holdings are wrong as well. Nevertheless the error, if there was an error at all, was only one of state law. As we explained in Zettlemoyer v. Fulcomer, 923 F.2d 284, 309 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991), it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim. The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension. The Supreme Court has recently restated this doctrine in Estelle v. McGuire, --- U.S. ----, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991):
 
 
 42
 Today, we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.
 
 
 43
 This case does not involve federal law, for there is no authority for a conclusion that, as a matter of due process of law, a state must provide for a special verdict when insanity is raised as a defense, as long as it allows a general verdict of not guilty to be returned on the basis of insanity.[19] Indeed, at oral argument Geschwendt could only proffer Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392, as a basis for the requirement that a special verdict must be available, but that case simply invalidated a statute prohibiting lesser included offense instructions in capital cases and cannot fairly be read as affecting state procedures for the return of not guilty verdicts. Thus, to uphold Geschwendt's claim, we would have to invent law by concluding that the United States Constitution compels a state to provide for a special verdict of not guilty by reason of insanity if it recognizes the insanity defense.
 
 
 44
 But we cannot require a special verdict as a matter of federal constitutional law, as we see no reason why a state could not provide for a civil commitment proceeding to determine a defendant's current mental state and thus the necessity for his confinement following a criminal trial, if a general verdict of not guilty is returned in a case in which sanity is in issue. After all, even a defendant acquitted on the merits of the case rather than on a finding of insanity could reasonably be made the subject of a civil commitment proceeding if his sanity had been in issue.[20] Unless a state could not have such a commitment procedure, this case does not raise a substantial federal claim.[21] We see no way to hold that fundamental fairness requires that a state authorize the return of a special verdict of not guilty by reason of insanity. See Estelle v. McGuire, 112 S.Ct. at 484; Cupp v. Naughten, 414 U.S. at 146, 94 S.Ct. at 400.
 
 
 45
 We recognize that in Hicks v. Oklahoma, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), a due process claim was based on an error of state law. In Hicks, the jury was instructed that if it found the defendant guilty of distributing heroin, it must sentence him to a 40-year term as an habitual offender whereas, under the retroactively effective state law, the jury could have sentenced him to a term of not less than ten years. Clearly Hicks is distinguishable from this case, for in Hicks the jury was given an erroneous instruction on substantive state law which forced it to return a verdict for a sentence four times longer than required, a fundamental error indeed. At Geschwendt's trial, however, the court properly defined insanity and correctly informed the jury that it could not find Geschwendt guilty unless the Commonwealth proved beyond a reasonable doubt that he was sane. Thus, unlike the instructions in Hicks, the charge in Geschwendt's case did not compel the jury to reach a result that it might have otherwise rejected. To the contrary, the court told the jury to return a not guilty verdict if the Commonwealth did not prove Geschwendt was sane, and he was substantively entitled to nothing more.
 
 
 46
 It therefore follows that, since the charge could not have misled the jury, Geschwendt's due process claim is necessarily dependent upon an assumption that the United States Constitution requires that a state provide for a special verdict based on insanity. But inasmuch as a state need not provide for such a verdict, the bottom line is inescapable: Geschwendt cannot receive federal habeas corpus relief for, if there was an error at all at his trial, it was solely one of state law.[22]
 
 B. The Effectiveness of Counsel
 
 47
 Geschwendt's second argument, that his attorney on the direct appeal was ineffective for failing to preserve and argue that the judge's failure to inform the jury of the possibility of a not guilty by reason on insanity verdict was erroneous, requires little discussion.[23] In order to avoid a remand for clarification of the district court's disposition of his motion to amend his petition, we will assume that his ineffective counsel argument is properly before this court even though neither the magistrate judge nor the district court considered the contention.
 
 
 48
 In addressing this ineffective assistance of counsel argument, we recognize that the Supreme Court of Pennsylvania indicated that Geschwendt did not raise as an issue a suggestion that the trial court failed to fully set forth the alternative verdict of not guilty by reason of insanity. Commonwealth v. Geschwendt, 500 Pa. at 135 n. 8, 454 A.2d at 999 n. 8. Nevertheless, the issue was considered by both the plurality and the dissenting justices, with different conclusions on the merits.
 
 
 49
 Notwithstanding the conclusion of the Supreme Court plurality that Geschwendt did not raise the form of verdict argument on the appeal, we have examined the brief Geschwendt filed on his appeal to that court and have concluded that, while the brief primarily focused on the issue of whether the jury should have been told the consequences of a verdict of not guilty by reason of insanity, it quite clearly challenged the trial court's failure to charge the jury that it could return a not guilty by reason of insanity verdict. Indeed, Geschwendt raised the issue both as a matter of constitutional and state statutory law. We need only quote from the brief to demonstrate our point:
 
 
 50
 If the jury is not informed as to the available choices it may make and the meaning of those choices, then a fair trial becomes impossible. If a trial by jury and a fair trial is to be meaningful, it must be a jury which understands the functions and powers of a jury in a criminal trial. It must be a jury which knows what type of verdicts may be returned and what each of these verdicts mean. A jury which is uninformed as to the meanings of all permissible verdicts denies the accused his due process right to a fair trial.
 
 
 51
 ....
 
 
 52
 Obviously most jurors are not familiar with this statute and thus it is the obligation of the trial judge, in the proper cases, to instruct the jury that in addition to the verdicts of guilty and not guilty, not guilty by reason of insanity is also a permissible verdict. Certainly if the jury was not informed of this permissible verdict, a full and informed decision could not be made. This is so because consideration would only be given to two of three permissible verdicts. It would appear that a trial judge is required to instruct the jury that a verdict of not guilty by reason of insanity is permissible in the appropriate cases, see 19 P.S. § 1351, and a fortiori, the judge is required to instruct the jury as to the meaning and consequences of this verdict (emphasis in original).
 
 
 53
 Inasmuch as we conclude, contrary to the plurality of the Supreme Court of Pennsylvania, that the attorney had in fact contended in that court that the trial court erred in not giving the jury the opportunity to return a verdict of not guilty by reason of insanity, he cannot have been ineffective for not raising it.
 
 III. CONCLUSION
 
 54
 In view of the foregoing, it is evident that there are three independent reasons why Geschwendt's argument that his due process rights were violated by the charge must be rejected. Furthermore, we reject his ineffective assistance of counsel claim. Consequently, we will affirm the judgment of the district court of March 21, 1991, denying habeas corpus relief.
 
 
 55
 ALDISERT, Circuit Judge, with whom Circuit Judges STAPLETON, COWEN and ROTH join, dissenting:
 
 
 56
 The question for decision in this appeal by George Geschwendt from a denial of federal habeas corpus relief is whether he was deprived of liberty without due process of law in violation of the Fourteenth Amendment when he was convicted of first-degree murder by a Pennsylvania jury that was not given the option of finding him not guilty by reason of insanity.
 
 
 57
 Geschwendt's sole defense was insanity. Pennsylvania statutes in effect since 1860 require that the jury be instructed that it has the option of returning a verdict of not guilty by reason of insanity in cases raising the insanity defense. The trial court denied Geschwendt's request for such an instruction. In my view, the court's denial of this third option verdict deprived Geschwendt of a right to liberty guaranteed by the due process clause of the Fourteenth Amendment. I would, therefore, reverse the judgment of the district court and remand with instructions to enter an order granting the petition for a writ of habeas corpus. Accordingly, I dissent.
 
 I.
 
 58
 Here we are faced with an appeal by an individual who was convicted by a state court jury in a high-profile, mass-murder case. In a case such as this, where it is difficult to muster any sympathy for the petitioner, the task of determining whether the state trial court protected his constitutional rights taxes the accountability, if not the very integrity, of the federal judicial system in its obligation to implement the Great Writ. In the allocation of competences between the state and federal judicial systems, the guilt or innocence of the petitioner must be decided by the state; the federal court may inquire only into the state's procedures to determine whether they pass constitutional muster.
 
 
 59
 As we measure the contours of the Constitution, federal judges are keenly aware that we do not engage in a popularity contest. We must disregard public opinion on a given issue or in a given case. As ultimate guardians of the Constitution, our role is to insure that society, when prosecuting those who breach its rules of conduct, does not breach its own rules of procedure. Our task in federal collateral review of state convictions, therefore, is not to inquire whether the habeas petitioner has violated rules of social conduct, but only whether society, in this case the Commonwealth of Pennsylvania, has respected the rules it has established to guarantee fair trials. I would hold that it has not.
 
 II.
 
 60
 Geschwendt's principal contention is that due process guaranteed him the fair opportunity to present his insanity defense to the jury, see United States ex rel. Smith v. Baldi, 192 F.2d 540, 544 (3d Cir.1951), aff'd, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953), and that this opportunity was foreclosed when the Pennsylvania trial court refused to instruct the jury that it could return a verdict of not guilty by reason of insanity. Geschwendt makes a classic procedural due process argument that he was deprived of both a quantum and a quality of liberty in the sense of freedom from physical restraint because his jury was not permitted to make an informed judgment regarding the possibility of reaching a verdict of not guilty by reason of insanity. He argues that had the jury rendered such a verdict, he would have been confined to a mental institution for "so long as [he] shall continue to be of unsound mind," rather than to a prison for six life terms. See 19 Pa.Stat.Ann. § 1351 (Purdon 1964).
 
 A.
 
 61
 Because this is the issue for decision, it is important to emphasize what is not. This is not a case governed by the holding in Schad v. Arizona, --- U.S. ----, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), which the majority vigorously endorse as "control[ling] the outcome of this appeal." Maj.Op. at 883. Schad merely addressed a lesser-included offense; it did not deal with a defense requiring an acquittal.
 
 
 62
 Schad does not stand as authority to excuse the Pennsylvania trial court's refusal to instruct the jury on the possible verdict of not guilty by reason of insanity. Schad discusses only a range of possible guilty verdicts; there is not one whit or tittle about acquittees. I believe the due process clause guaranteed Geschwendt the right to the option of becoming a "committed acquittee," one who has been found not guilty by reason of insanity and who consequently has been committed to a mental institution. See, e.g., Foucha v. Louisiana, --- U.S. ----, ----, 112 S.Ct. 1780, 1783, 118 L.Ed.2d 437 (1992); Jones v. United States, 463 U.S. 354, 367-68, 103 S.Ct. 3043, 3051, 77 L.Ed.2d 694 (1983).
 
 
 63
 The majority insist that the Pennsylvania proceedings in this case pass due process muster because under the teachings of Schad, the third option verdict of not guilty by reason of insanity was not necessary because the trial court permitted the jury to return a verdict of guilty of third-degree murder by reason of his mental condition. The problem with this analysis is evident: Geschwendt had a federal constitutional right to be afforded the option of being acquitted, albeit for reason of insanity; and being acquitted is neither the jurisprudential nor the due process equivalent of being convicted of a lesser-included offense.
 
 
 64
 The majority improperly confuse defense apples with lesser-included offense oranges. I find it appropriate to paraphrase Justice Brennan's language in a recent "committed acquittee" case: The majority begin by posing the wrong question. The issue in this case is not whether the jury instruction properly charged on a lesser-included offense. The question before us is whether the trial judge's refusal to charge on a possible verdict of not guilty by reason of insanity constituted a denial of due process. Jones v. United States, 463 U.S. 354, 371, 103 S.Ct. 3043, 3053, 77 L.Ed.2d 694 (1983) (Brennan, J., dissenting).
 
 III.
 
 65
 Although I do not consider a discussion of the lesser-included offense doctrine relevant to the "committed acquittee" issue before us, I will meet the majority's argument head-on and demonstrate that, even if relevant, the teachings of Schad do not rescue the Pennsylvania trial court from the consequences of disavowing rights guaranteed by the due process clause.
 
 A.
 
 66
 In Schad, the Court held that the refusal to charge on the lesser-included offense of robbery was harmless error. Applying Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Court determined that the fact "that the jury's 'third option' was second-degree murder rather than robbery [did] not diminish the reliability of the jury's capital murder verdict." 111 S.Ct. at 2505. But the court explained:
 
 
 67
 That is not to suggest that Beck would be satisfied by instructing the jury on just any lesser included offense, even one without any support in the evidence. Cf. Roberts v. Louisiana, 428 U.S. 325, 334-35, 96 S.Ct. 3001, 3006-07, 49 L.Ed.2d 974 (1976) (plurality opinion). In the present case, however, petitioner concedes that the evidence would have supported a second-degree murder conviction, Brief for Petitioner 18-19, and that is adequate to indicate that the verdict of capital murder represented no impermissible choice.
 
 
 68
 Id. (emphasis added). By "no impermissible choice," the Court meant that the alternative instruction in that case was supported by the evidence and thus represented a viable option for the jury. The Court made clear, however, that to save the instruction, any lesser-included offense must be supported by the evidence; if no evidentiary support is present, the lesser-included offense instruction is deficient as a matter of law.
 
 
 69
 In the present case the lesser-included offenses were third-degree murder and voluntary manslaughter. Under Pennsylvania law in effect at the time of Geschwendt's trial, a conviction of either of these offenses would have required the jury to find that Geschwendt's acts were not "wilful, deliberate, intentional and premeditated." App. at 101A. Such a finding would have been in stark contrast with the uncontroverted evidence that supported only a verdict of first-degree murder or of not guilty by reason of insanity. Geschwendt's acts were not committed in the heat of passion, nor were they reckless; they were wilful, deliberate, intentional and premeditated, and the jury could not have found otherwise.
 
 
 70
 Indeed, Geschwendt never attempted to prove third-degree murder or voluntary manslaughter. He confessed to conduct that was wilful, deliberate, intentional and premeditated. The majority agree that "Geschwendt had intended to kill the entire [Abt] family." Maj.Op. at 879. It was "a carefully planned, calculated mass homicide which he attempted to conceal both before and after the fact." Id. at 888.
 
 
 71
 Geschwendt's entire defense to the first-degree murder charge was insanity. He introduced expert psychiatric testimony supporting this defense. He did not request a jury instruction on third-degree murder or voluntary manslaughter; nor did the prosecution, which relied solely on the theory that Geschwendt was guilty of first-degree murder. The trial court decided sua sponte to charge the jury on the lesser-included offenses, and rejected Geschwendt's request for a third option verdict of not guilty by reason of insanity, even though the evidence offered by the prosecution and defense focused entirely on the question of Geschwendt's sanity.
 
 
 72
 Because the evidence did not support the jury charges on third-degree murder and voluntary manslaughter, this case is beyond the pale of Schad.
 
 B.
 
 73
 Nonetheless, the majority devote considerable time to the proposition that somehow Schad v. Arizona controls and that the jury charges at issue here complied with the requirements of that case. The majority divine from Schad the proposition that "in cases involving offenses on a ladder, if the trial court wrongfully refuses to charge the offense at the bottom rung, that error is harmless provided the jury returns a guilty verdict for an offense higher up rather than for an intermediate offense which was also charged." Maj.Op. at 884. Not only does this statement fail to mention the possibility of an acquittal, but it also squarely contradicts our holding in Vujosevic v. Rafferty, 844 F.2d 1023 (3d Cir.1988) (failure to instruct on a lesser-included offense supported by the evidence is not harmless error). Were this statement not classic obiter dictum, it would overrule Vujosevic by implication, notwithstanding the disclaimer in footnote 13, Maj.Op. at 884-885, that the court expresses no opinion on Vujosevic. Indeed, the majority appear to follow the lead of Lord Byron's Julia, who "whispering, 'I will ne'er consent'--consented."[1] The majority's dictum, however, is unsupported by law and rests on conjecture, if not false assumptions, about how juries evaluate evidence. I trust that in future cases presenting this question, the court will adhere to its clear statement in footnote 13 and continue to recognize the vitality of Vujosevic.
 
 C.
 
 74
 The majority seem to suggest that the trial court's instruction on third-degree murder was fundamentally similar to a third option verdict of not guilty by reason of insanity, because both third-degree murder and the insanity defense involve the defendant's incapacity to form the requisite intent. Id. at 886. The Pennsylvania Supreme Court has explicitly rejected this argument:
 
 
 75
 No such direct relationship exists in the Pennsylvania legislative scheme between the mens rea element of murder and the affirmative defense of insanity. Sanity of the accused is not a prerequisite to the Commonwealth's making out a case of third degree murder. It is instead addressed solely to penological concerns, i.e., whether the defendant should be punished for his wrongdoing. In assessing sanity, a court is not concerned with whether the defendant committed the act (the actus reus)--in most cases where insanity is plead the defendant acknowledges his conduct--or with whether he had formed the prescribed mental state (the mens rea), but rather it is concerned with the societal judgment of whether the defendant should be held criminally responsible for his act.
 
 
 76
 Commonwealth v. Reilly, 519 Pa. 550, 565-66, 549 A.2d 503, 510-11 (1988).
 
 
 77
 In Vujosevic, we determined that the district court had erred in failing to instruct the jury on the lesser-included offense of aggravated assault, which was supported by the record. Engaging in a harmless error analysis, we held that "the instruction on simple manslaughter was not a constitutionally adequate substitute for an instruction on aggravated assault" because it "did not necessarily offer the jury a rational compromise between aggravated manslaughter and acquittal; only an aggravated assault charge could do that." 844 F.2d at 1028.
 
 
 78
 Accordingly, I believe that the trial court's instructions on the lesser-included offenses of third-degree murder and voluntary manslaughter in Geschwendt's case were not viable alternatives on this record; they were not a constitutionally adequate substitute for the instruction on the third option verdict of not guilty by reason of insanity.
 
 D.
 
 79
 It also is important to note what other points are not relevant here. We do not have a claim that in 1976 the Pennsylvania trial court was required to instruct the jury as to the consequences of a verdict of not guilty by reason of insanity. We also do not have a claim that Pennsylvania law is constitutionally infirm because it does not permit an insanity defense. See Foucha v. Louisiana, --- U.S. at ----, 112 S.Ct. at 1789 (O'Connor, J., concurring) ("The Court does not indicate that the States must make the insanity defense available."); see also Ake v. Oklahoma, 470 U.S. 68, 91, 105 S.Ct. 1087, 1100, 84 L.Ed.2d 53 (1985) (Rehnquist, J., dissenting) ("It is highly doubtful that due process requires a State to make available an insanity defense to a criminal defendant.)." The Commonwealth of Pennsylvania recognizes this defense and has done so since Pennsylvania was one of the thirteen colonies. See Commonwealth v. Smith, 374 Pa. 220, 226-27, 97 A.2d 25, 29 (1953) (restating rule that a defendant has a right not to pay the penalty for an action if his or her mental condition does not satisfy the legal test for sanity); Commonwealth ex rel. Smith v. Ashe, 364 Pa. 93, 106-07, 71 A.2d 107, 115, cert. denied, 340 U.S. 812, 71 S.Ct. 40, 95 L.Ed. 597 (1950) (recognizing that an individual's insanity at the time of an offense requires an acquittal).
 
 
 80
 I now turn to Geschwendt's basic due process argument that he was denied both a quantity and a quality of liberty when the third option verdict of not guilty by reason of insanity was withheld from the jury.
 
 IV.
 
 81
 This argument invokes a fundamental concept, properly expressed in the teachings of Hicks v. Oklahoma, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980):
 
 
 82
 Where ... a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. That defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State. In this case Oklahoma denied the petitioner the jury sentence to which he was entitled under state law, simply on the frail conjecture that a jury might have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision. Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law.
 
 
 83
 Id. at 346, 100 S.Ct. at 2229 (citations omitted) (footnote omitted). The majority nonchalantly slough off this fundamental precept and suggest that any violation of state law in this case would not rise to a constitutional deprivation. See Maj.Op. at 888-889. This analysis contradicts both specific Supreme Court teachings on "committed acquittees" and this court's recognition that when a state, such as Pennsylvania, has created an insanity defense, "due process guarantees all defendants fair opportunity to present the defense." United States ex rel. Smith v. Baldi, 192 F.2d at 544; see also Thomas v. Cunningham, 313 F.2d 934, 938 & n. 7 (4th Cir.1963) ("Procedural due process requires that a state shall afford [a defendant] adequate opportunity to raise [an insanity defense].").
 
 
 84
 The Supreme Court has elevated a defendant's opportunity to be a "committed acquittee" to a right protected by the due process clause. As recently as May 18, 1992, the Supreme Court reaffirmed this concept of due process:
 
 
 85
 We held [in Jones v. United States, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) ], however, that "[t]he committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous," id., at 368 [103 S.Ct. at 3052]; i.e. the acquittee may be held as long as he is both mentally ill and dangerous, but no longer. We relied on O'Connor v. Donaldson, 422 U.S. 563 [95 S.Ct. 2486, 45 L.Ed.2d 396] (1975), which held as a matter of due process that it was unconstitutional for a State to continue to confine a harmless, mentally ill person.
 
 
 86
 Foucha v. Louisiana, --- U.S. at ----, 112 S.Ct. at 1784 (emphasis added).
 
 
 87
 Geschwendt alleges that the trial court's denial of an opportunity for confinement to a mental institution for "so long as [he] shall continue to be of unsound mind," instead of to a prison for life, deprived him of both a quantum and a quality of liberty. Based on the Supreme Court's teachings, there is no doubt that when a defendant is denied the opportunity of becoming a committed acquittee and of being placed in a mental institution until he has recovered his sanity or is no longer dangerous and instead is given only the option of the death penalty or of serving six life terms in a penal institution, that individual has been denied due process. Nothing in the majority opinion comes to grips with this key issue. Nothing in the majority's labored rationalization of the mechanics of the third-degree murder verdict option comes to grips with Geschwendt's constitutional right to an opportunity to become a committed acquittee. An individual found guilty of third-degree murder is not, by any stretch of an innovative imagination, considered an "acquittee."
 
 
 88
 I had always thought there was a difference between being found guilty and being acquitted. I thought that this was a basic principle taught in junior high school civics classes. I am, therefore, somewhat distressed that the majority are not willing to extend the same right to be found not guilty by reason of insanity that the U.S. District Court for the District of Columbia accorded John Hinckley, Jr., who, after attempting to assassinate then President Ronald Reagan in 1981, successfully interposed this defense.[2]
 
 
 89
 The right to be committed to a mental institution, rather than imprisoned in a penitentiary, also was the critical issue in the plea entered this year in the internationally publicized case of Jeffrey L. Dahmer, who admitted strangling and dismembering 17 young males. He was permitted under Wisconsin law to plead not guilty of murder by reason of mental disease or defect, which constitutes an admission as to the elements of the substantive offense, except for the mental state, and raises a defense of insanity. Dahmer thus was entitled to a fair determination of his mental capacity, notwithstanding the extreme brutality of his crimes.[3]
 
 
 90
 I am melancholy that this court, long recognized as a shining acropolis of constitutional law protection, now stands in the shade. In the shade of a federal district court in our nation's capital and a state trial court in Wisconsin.
 
 
 91
 There is a fundamental difference between being found guilty of an offense and being acquitted, albeit by reason of insanity. Every member of this court knows this. And irrespective of the reprehensible acts committed in this case, we are a reviewing court of judges; we are not an ingathering or collection of the laity, untrained in the law. As judges we must rise above the passions of the streets, above superstition or popularity or opprobrium. In the words of Justice Felix Frankfurter, we are committed to the "institutionalized medium of reason, [and] that's all we have standing between us and the tyranny of mere will and the cruelty of unbridled, unprincipled, undisciplined feeling."[4]
 
 
 92
 We have held that "[t]o deny [a defendant] the possibility of a lesser restraint of liberty because of a practice which permits arbitrary trial court activity is offensive to ... settled concepts of due process." United States ex rel. Matthews v. Johnson, 503 F.2d 339, 345 (3d Cir.1974) (in banc), cert. denied, 420 U.S. 952, 95 S.Ct. 1336, 43 L.Ed.2d 430 (1975). Involved here are those precepts of constitutional law that concern "the domain of liberty, withdrawn by the Fourteenth Amendment from encroachment by the states." Palko v. Connecticut, 302 U.S. 319, 327, 58 S.Ct. 149, 153, 82 L.Ed. 288 (1937), overruled on other grounds by Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Freedom from physical restraint without due process of law is among those " 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions,' " Powell v. Alabama, 287 U.S. 45, 67, 53 S.Ct. 55, 63, 77 L.Ed. 158 (1932) (quoting Herbert v. Louisiana, 272 U.S. 312, 316, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926)); is "basic to our system of jurisprudence," In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948); and is "essential to a fair trial." Gideon v. Wainwright, 372 U.S. 335, 342-44, 83 S.Ct. 792, 795-96, 9 L.Ed.2d 799 (1963); see Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965).
 
 
 93
 With these axioms of procedural due process as a jurisprudential backdrop, I now must examine the substantive Pennsylvania law governing the criminal trials. This is necessary because the majority have affirmed the district court on the basis of one issue. Because I would reverse, I must respond to all of the Commonwealth's contentions before us.
 
 
 94
 First, I will meet the Commonwealth's argument that the trial court observed all the state law requirements in this case because a third option verdict of not guilty by reason of insanity was not necessary under Pennsylvania law at the time of Geschwendt's trial. Once I demonstrate that this contention is not persuasive, I will show, albeit in some repetitive fashion, how the state trial court's denial of the third option verdict violated Geschwendt's due process rights.
 
 V.
 
 95
 At the time of Geschwendt's trial in 1976, two Pennsylvania statutes required that a jury acquitting a defendant on the basis of insanity state the reason for such acquittal in the verdict. First and foremost, the Act of March 31, 1860, P.L. 427, § 66, as amended, provided:
 
 
 96
 In every case in which it shall be given in evidence upon the trial of any person charged with any crime or misdemeanor, that such person was insane at the time of the commission of such offence, and he shall be acquitted, the jury shall be required to find specially whether such person was insane at the time of the commission of such offence, and to declare whether he was acquitted by them on the ground of such insanity; and if they shall so find and declare, the court before whom the trial is had shall order the cost of prosecution to be paid by the county, and shall have power to order him to be kept in strict custody, in such place and in such manner as to the said court shall seem fit, at the expense of the county in which the trial is had, so long as such person shall continue to be of unsound mind.
 
 
 97
 19 Pa.Stat.Ann. § 1351 (Purdon 1964) (emphasis added) [hereinafter "Act of 1860"], repealed by Act of April 28, 1978, P.L. 202, § 2(a), 42 Pa.Cons.Stat. § 20002(a) (Supp.1982) (effective June 27, 1980). The Mental Health and Mental Retardation Act of 1966[5] also provided:
 
 
 98
 (a) Whenever any person charged with any crime is acquitted on the ground of insanity or having been insane at the time he committed the crime, the jury or the court as the case may be, shall state such reason for acquittal in its verdict.
 
 
 99
 (b) In such event, the court may direct the Attorney for the Commonwealth to act as petitioner to initiate commitment proceedings under section 406.
 
 
 100
 50 Pa.Stat.Ann. § 4413 (Purdon 1969), repealed in part by Act of July 9, 1976, P.L. 817, § 502, 50 Pa.Stat.Ann. § 7502 (Purdon 1976).
 
 
 101
 After presenting insanity as his sole defense, Geschwendt's trial counsel brought to the trial court's attention the criminal procedure requirements of the Act of 1860, as amended, and asked the court to instruct the jury on the possible verdict of not guilty by reason of insanity:
 
 
 102
 DEFENSE COUNSEL: I would take exception to Your Honor's second failure to charge regarding the specific alternative possibility of a verdict of not guilty by reason of insanity in accordance with 19 Purdon's 1351 which, I believe, requires the instruction be given to the jury--the option be given to the jury, unless I misread it.
 
 
 103
 THE COURT: I do not follow you at all on that.
 
 
 104
 DEFENSE COUNSEL: It's my feeling they should be specifically instructed there is an alternative not guilty verdict which specifically states not guilty by reason of insanity. I believe that's what the statute says.
 
 
 105
 THE COURT: An exception is granted.
 
 
 106
 App. at 43A.
 
 
 107
 On appeal to the Pennsylvania Supreme Court, Geschwendt argued that the trial court erred in refusing to inform the jury of the consequences of a verdict of not guilty by reason of insanity. Commonwealth v. Geschwendt, 500 Pa. at 124, 454 A.2d at 993. The plurality discussed at length whether to give retroactive effect to the holding in Commonwealth v. Mulgrew, 475 Pa. 271, 380 A.2d 349 (1977), that a jury must be instructed on the consequences of a verdict of not guilty by reason of insanity. The three-judge plurality concluded that it should not, and thus rejected Geschwendt's argument. 500 Pa. at 135, 454 A.2d at 999.
 
 
 108
 Justice Roberts, writing for the dissenting three judges, responded that the retroactivity analysis was unnecessary. Instead, he characterized as "critical" the trial judge's erroneous refusal to "honor the fundamental request of appellant that the jury be instructed 'regarding the specific alternative possibility of a verdict of not guilty by reason of insanity.' " Id. at 136, 454 A.2d at 1000 (Roberts, J., dissenting). Justice Roberts concluded: "Because appellant's sanity was a central issue, upon which substantial evidence was offered by both the defense and prosecution, appellant was statutorily entitled to an instruction that would have informed the jury of its right to return a verdict of not guilty by reason of insanity." Id. (Roberts, J., dissenting).
 
 VI.
 
 109
 For three separate reasons, I would reject the Commonwealth's contention that Pennsylvania trial courts were not compelled to offer this third option verdict in insanity defense cases at the time of Geschwendt's trial in 1976, and that the option did not become required by law until a year later, when the Pennsylvania Supreme Court handed down its decision in Mulgrew.
 
 A.
 
 110
 First, to accept this notion is to suggest that only a court, and not the legislature, may create the substantive law of Pennsylvania. The absurdity of this proposition is manifest. For more than 100 years prior to Geschwendt's trial, the legislature had commanded, in one form or another, that "the jury shall be required to find specially whether such person was insane at the time of the commission of such offence, and to declare whether he was acquitted by them on the ground of such insanity," 19 Pa.Stat.Ann. § 1351 (Purdon 1964), or that the "jury or the court as the case may be, shall state such reason for acquittal in its verdict." 50 Pa.Stat.Ann. § 4413(a) (Purdon 1969). It logically follows from the plain language of these statutes that a jury must be instructed on a verdict of not guilty by reason of insanity whenever the insanity defense is raised. A defendant simply cannot be found not guilty by reason of insanity, as directed by the Pennsylvania legislature, if such a verdict is not made known to the jury. See Commonwealth v. Trill, 374 Pa.Super. 549, 567, 543 A.2d 1106, 1114-15 (1988), appeal denied, 522 Pa. 603, 562 A.2d 826 (1989).
 
 
 111
 Case law demonstrates that Pennsylvania trial judges and practitioners in criminal courts routinely respected the directive of these statutes. Long before the Mulgrew decision, trial judges and lawyers followed the clear language of the Act of 1860 and the teachings of other Pennsylvania Supreme Court cases. For example, as early as 1911, the Pennsylvania Supreme Court discussed the significance of the Act of 1860:
 
 
 112
 When insanity is set up as a defense to an indictment charging the commission of a crime, it becomes, under the act of 1860, a distinct issue before the jury, and if, in their judgment, the accused ought to be acquitted because he was insane at the time he committed the act charged against him, there must be a special finding by the jury of insanity as the groun[d] of acquittal.
 
 
 113
 Commonwealth v. Molten, 230 Pa. 399, 402, 79 A. 638, 638 (1911) (emphasis added); accord Commonwealth v. Ragone, 317 Pa. 113, 122-23, 176 A. 454, 458 (1935).
 
 
 114
 Moreover, in 1959, the Pennsylvania Trial Guide included the following "approved charge" on a defense of insanity:
 
 
 115
 "The plea of insanity at the time of committing the crime is a well recognized defense.... If the defendant has satisfied you by fairly preponderating evidence that he was insane at the time (deceased met his death), although the Commonwealth has convinced you that the defendant did the (killing), you would find him not guilty (by reason of insanity)."
 
 
 116
 Burton R. Laub, Pennsylvania Trial Guide § 194.1(1), at 368 (1959 & Supp.1968) (quoting Commonwealth v. Smith, 374 Pa. at 226, 97 A.2d at 29). The cases illustrate use of similar instructions. See, e.g., Commonwealth v. Patskin, 372 Pa. 402, 419, 93 A.2d 704, 713 (1953) ("If you find, by the fair weight and preponderance of the evidence, that the defendant ... was insane within the legal meaning of the term, at the time of the commission of the offense, your verdict must be not guilty by reason of insanity."), cert. denied, 347 U.S. 931, 74 S.Ct. 534, 98 L.Ed. 1082 (1954).
 
 B.
 
 117
 Second, the precise issue before the Pennsylvania Supreme Court in Mulgrew was "whether the court below erred in failing to instruct the jury concerning the consequences of a verdict of not guilty by reason of insanity," 475 Pa. at 275, 380 A.2d at 351, and not whether Pennsylvania law required that an instruction be given on the availability of such a verdict. If anything, the issue and decision in Mulgrew presupposed that the jury would be given the option of finding the defendant not guilty by reason of insanity. In overruling its prior decision in Commonwealth v. Gable, 323 Pa. 449, 187 A. 393 (1936), the court held "that it is proper to instruct the jury concerning the possibility of commitment proceedings being initiated against the defendant if such defendant is acquitted of the criminal charge filed against him by reason of an insanity defense." 475 Pa. at 275, 380 A.2d at 351. The court reasoned that
 
 
 118
 explaining the consequences of acquittal by reason of insanity to a jury will assist the jury in properly determining the guilt or innocence of a defendant. By such an instruction we reduce the possibility of compromise verdicts of guilty occasioned by a jury's misapprehension of "acquitting" a defendant by reason of insanity.
 
 
 119
 Id. at 276, 380 A.2d at 352. Thus, the purpose of the Mulgrew rule was to clear up any juror confusion regarding the meaning of one of the three possible verdicts required by law in insanity defense cases.
 
 C.
 
 120
 Third, the practice of instructing on the third option verdict was so uniformly recognized that when the issue was presented to the Pennsylvania Supreme Court in 1987, the court held that the failure of defense counsel to request such a verdict constituted ineffective assistance of counsel under the Sixth Amendment. Commonwealth v. Gass, 514 Pa. 287, 294, 523 A.2d 741, 744 (1987). The court concluded that the failure to request an instruction at all was worse than failing to request an instruction regarding the consequences of the third option verdict:
 
 
 121
 In the instant case, not only was the meaning of a not guilty by reason of insanity verdict not explained to the jury, they were not even advised that it was a possible verdict. Based on the instruction that was given, we cannot assume that they understood that if they believed the insanity defense, they could find the Appellant not guilty by reason of insanity, when they were told there were only five possible verdicts that they could reach. Nor can we speculate as to what the verdict would have been had they been properly instructed.
 
 
 122
 Id. at 293, 523 A.2d at 744.
 
 VII.
 
 123
 Borrowing the language of the Pennsylvania Supreme Court, we also cannot "speculate as to what the verdict would have been [in this case] had [the jury] been properly instructed." Id. Here we have a man who confessed to the brutal killing of six people over a period of six hours. His only defense was insanity; yet the jury was instructed to bring back an either/or verdict--guilty or not guilty:
 
 
 124
 If you would conclude that the Commonwealth has not met its burden as to any of the above, then the Commonwealth should suffer an acquittal and you should find the defendant not guilty and that would be the end as to your deliberations. [App. at 106A.]
 
 
 125
 As I said to you before, it would appear to me, but again I repeat it ... for you, that the defendant is either guilty or not guilty of all of the various informations charging him with the killing of the five members of the Abt family and Garson Engle. [Id. at 114A.]
 
 
 126
 In view of what I have said regarding the legal test of insanity and the Commonwealth's burden of proof, you cannot find the defendant guilty unless you are satisfied beyond a reasonable doubt that at the time of the killing either the defendant had no mental disease or defect or, if he did have a mental disease or defect, that he was not as a result of such disease or defect, incapable of knowing what he was doing or of judging that it was wrong to do what you conclude he did. [Id. at 108A.]
 
 
 127
 If the Commonwealth has sustained its burden of proof as I have outlined it for you, do not for one moment be fearful to return a verdict of guilty in such degree as you determine the Commonwealth has demonstrated to you. If, on the other hand, the Commonwealth has not sustained its burden of proof, then it is your duty to render a verdict of not guilty and you should not be fearful of doing so. [Id. at 117A.]
 
 
 128
 Thus, in the matrix given them, the members of the jury reasonably could have concluded that had they found the defendant insane, they would have had to acquit him.
 
 
 129
 Without the third option verdict, the jurors reasonably could have concluded that a verdict of not guilty would have released this man to the streets, to kill again. This is not only a permissible inference, but a reasonable one, and perhaps, under the circumstances of this case, a compelling one. The jury could have found Geschwendt insane, yet at the same time guilty; it could have found him guilty out of fear of releasing him to kill again.
 
 
 130
 I cannot conclude as a matter of law that the jury could not have so rationalized its verdict. As early as 1860, the Pennsylvania legislature recognized this possible foible in human nature and created a mechanism to discourage, if not totally eliminate, this possibility. That mechanism is the third option verdict of not guilty by reason of insanity, an option that was withheld from the jury in this case. Had the trial court given the jury the option of finding Geschwendt not guilty by reason of insanity, I believe that the jury could have concluded, based on the common sense and life experiences of reasonable lay men and women, that such a verdict would have provided a basis for restricting Geschwendt's freedom and for not releasing him to the streets.
 
 
 131
 Moreover, at the time of Geschwendt's trial, a trial court did not have the power to commit a defendant to a mental institution for treatment unless the jury returned a verdict of not guilty by reason of insanity. See 19 Pa.Stat.Ann. § 1351 (Purdon 1964); 50 Pa.Stat.Ann. § 4413(b) (Purdon 1969); see also Commonwealth ex rel. DiEmilio v. Shovlin, 449 Pa. 177, 178-80, 295 A.2d 320, 321-22 (1972). Thus, if Geschwendt's jury had returned a verdict of not guilty, without an expression that it was based on insanity, the trial court would have had no choice but to release him from custody.
 
 
 132
 I recognize that until Mulgrew the trial court had no duty to instruct the jury on the consequences of a verdict of not guilty by reason of insanity, but I believe that the court's failure in this case to give the jury the option of such a verdict ignored a very important purpose of the statutes: to provide psychiatric treatment for those so mentally imbalanced that society has chosen not to hold them criminally responsible for their acts. By refusing to give the option to the jury, the trial court essentially abdicated its responsibility under Pennsylvania law.
 
 
 133
 The question then becomes: Did this violation of state law constitute a deprivation of due process under the Fourteenth Amendment? As previously discussed in Sections I-IV, I would answer this question in the affirmative.
 
 VIII.
 
 134
 The gravamen of the due process deprivation in this case is that under the terms of the Pennsylvania Mental Health and Mental Retardation Act of 1966, 50 Pa.Stat.Ann. §§ 4406(a), 4413(b) (Purdon 1969), an individual found not guilty by reason of insanity was entitled to "commitment to an appropriate facility for examination, observation and diagnosis," and "[i]f, upon examination, it is determined that such person is in need of care at a facility, the examining physicians or director ... shall immediately report to [the] court which may order the commitment of such person for care and treatment." The Act of 1860, as amended, 19 Pa.Stat.Ann. § 1351 (Purdon 1964), set forth as a cross reference in 50 Pa.Stat.Ann. § 4413, provided that any commitment to a mental institution for treatment would be for "so long as such person shall continue to be of unsound mind."
 
 
 135
 Thus, at the time of Geschwendt's trial, the consequences of verdicts under all three options could be summarized as follows: (1) verdict of guilty of murder in the first degree: the death penalty or a life sentence in a penal institution; (2) verdict of not guilty by reason of insanity: probable commitment to a mental institution for care and treatment so long as the impaired mental condition continues; and (3) verdict of not guilty simpliciter: Total freedom. An unconditional acquittal.[6]
 
 
 136
 Geschwendt argues that the jurors may have found him insane, but because they were unwilling to release him to the streets, they returned a verdict of guilty that resulted first in a death sentence, and later in a life sentence in a penal institution. From this he argues that he was denied both a quantum and a quality of freedom, as embodied in the concept of liberty under the due process clause of the Fourteenth Amendment, because the trial court refused to instruct the jury on the third option as required under Pennsylvania law. I agree.
 
 
 137
 "Insanity being a defense under Pennsylvania law, due process guarantees all defendants fair opportunity to present the defense." United States ex rel. Smith v. Baldi, 192 F.2d at 544. The Pennsylvania trial court here did not afford Geschwendt the required fair opportunity to present his only defense. Although the court permitted him to interpose his insanity defense by argument and by testimony, the jury was allowed to consider it only in terms of a verdict of not guilty simpliciter. Because the jury was denied the opportunity to consider it in connection with the provisions of the Act of 1860, as amended, and the Mental Health and Mental Retardation Act of 1966, he was not given a fair opportunity to present the full defense of not guilty by reason of insanity. Accordingly, Geschwendt's trial did not meet the requirements of the due process clause.
 
 IX.
 
 138
 I would reverse the judgment of the district court and remand the cause with instructions that the court enter an order granting the petition for writ of habeas corpus and directing Geschwendt's release from custody unless the Commonwealth of Pennsylvania accords him a new trial within a reasonable period of time. Such an order should provide, of course, that even in the absence of a new trial, Geschwendt need not be released if he is civilly committed by the state within a reasonable period of time.
 
 
 139
 Accordingly, I dissent.
 
 
 
 [1]
 In theory, the jury could have returned inconsistent verdicts, but the court told the jury that such verdicts would not be in keeping with the evidence. Inasmuch as the circumstances of the murders were indistinguishable, we sometimes refer to them as though they constituted a single offense
 
 
 [2]
 The Superior Court decision is reported at Commonwealth v. Geschwendt, 271 Pa.Super. 102, 412 A.2d 595 (1979)
 
 
 [3]
 Mulgrew overruled Commonwealth v. Gable, 323 Pa. 449, 453, 187 A. 393, 395 (1936), which held that a trial court was not obliged to tell a jury that a verdict of not guilty by reason of insanity will result in a defendant's being sent to a state psychiatric institution
 
 
 [4]
 Geschwendt did challenge that holding in his petition, but the magistrate judge rejected the argument and her report was approved in this respect by the district court
 
 
 [5]
 He raised other issues as well, but as they are not pressed on this appeal, we do not describe or address them
 
 
 [6]
 The district court did, however, accept the report and recommendation to the extent that it rejected Geschwendt's claims
 
 
 [7]
 The district court granted a certificate of probable cause for the appeal
 
 
 [8]
 For the reasons we set forth in section II.B., we are satisfied that Geschwendt has exhausted his state remedies with respect to the charge. Inasmuch as we are deciding this case through the interpretation and application of legal precepts, we exercise plenary review. Zettlemoyer v. Fulcomer, 923 F.2d 284, 291 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991)
 
 
 [9]
 The Commonwealth also contends that a court was not required to charge on an alternative verdict of not guilty by reason of insanity, but it relies only on the district court's opinion and Mulgrew as support for its contention
 
 
 [10]
 He also sought a charge on theft but we need not discuss that separately
 
 
 [11]
 The Supreme Court also rejected Schad's contention that the jury had to be told that it must be unanimous on its theory of murder
 
 
 [12]
 At oral argument, Geschwendt noted that on Schad's direct appeal from his conviction, State v. Schad, 163 Ariz. 411, 417, 788 P.2d 1162, 1168, (1989), the Supreme Court of Arizona held that Schad was not entitled to a charge that he could be convicted of robbery, even though the evidence could have supported a conviction for that offense. The Arizona court reached this conclusion because in Arizona there is no lesser included offense to felony murder. But Geschwendt's observation on the point does not help him, as it only explains why as a matter of state law the charge was not required. The Supreme Court of the United States did not decide the case on the basis that it would honor state law on this point. Quite to the contrary, it treated the robbery as a lesser included offense but then found that any error in the court's failure to charge it was harmless, so that it was able to uphold the conviction in the face of Beck. It is not surprising that the Supreme Court would not decide the case under Arizona law, as the rule that there is no lesser included offense to felony murder is the functional equivalent of the Alabama statute invalidated in Beck. The dissent in Schad pointed out that notwithstanding Arizona law, robbery was a lesser included offense of felony murder, but disagreed with the majority opinion, as it concluded that due process of law required that the trial court give a robbery instruction. Thus, on the basis of both opinions, it is impossible to explain away Schad on a state law analysis
 
 
 [13]
 In reaching our result, we have not overlooked United States ex rel. Matthews v. Johnson, 503 F.2d 339, 346 (3d Cir.1974) (in banc), cert. denied, 420 U.S. 952, 95 S.Ct. 1336, 43 L.Ed.2d 430 (1975), in which a state judge charged the jury on first and second degree murder but, in violation of due process of law, did not charge on voluntary manslaughter. The Commonwealth urged that the error was harmless since the defendant was convicted of first degree murder. We disagreed because we thought that there would have been a greater possibility of a compromise verdict if all three options were given. Since precisely the same argument could have been made in Schad, Matthews has been overruled with respect to this holding. We are also aware of Vujosevic v. Rafferty, 844 F.2d 1023 (3d Cir.1988). Vujosevic was a habeas case in which the state defendant was convicted of aggravated manslaughter as a lesser included offense on a murder indictment. The trial judge also charged manslaughter as a lesser included offense but erroneously refused to charge on aggravated assault, a still lesser included offense. The Appellate Division of the Superior Court of New Jersey affirmed, reasoning that if the jury believed that only an assault was involved, it would have convicted the defendant of manslaughter, the least serious conviction available under the court's charge. State v. Vujosevic, 198 N.J.Super. 435, 444-46, 487 A.2d 751, 756-57 (App.Div.), certif. denied, 101 N.J. 247, 501 A.2d 920 (1985). We, however, disagreed, as we thought that the defendant's own testimony would have made a manslaughter conviction "nonsensical" and because we did not think that manslaughter necessarily offered a rational compromise between aggravated manslaughter and acquittal. While Schad may have cast some doubt on the holding in Vujosevic, it is not necessary for us to decide whether Vujosevic is still good law as it would not have been 'nonsensical' for the jury to have convicted Geschwendt of third degree murder if it did not want to find Geschwendt not guilty even though the Commonwealth had not established that he was sane. We note that the dissent urges that our ladder analysis is flawed in part because it contradicts our holding in Vujosevic. While we have attempted to accommodate Vujosevic to our holding, obviously if our ladder analysis cannot be reconciled with Vujosevic, then it is that case which must fall since our ladder is anchored on Schad
 
 
 [14]
 Inasmuch as we are making an analysis of why the third degree murder charge was appropriate, it would be superfluous to discuss the voluntary manslaughter charge in detail, and thus we do not do so
 
 
 [15]
 Our own cases make it clear that a defendant in Pennsylvania may rely on both the insanity and diminished capacity defenses in the same case. See Rock v. Zimmerman, 959 F.2d 1237, 1243 (3d Cir.1992) (in banc). The dissent in attempting to meet our description of how the jury could have easily accommodated the evidence and the charge to a third degree conviction, does not make an analysis of specific portions of the charge germane to the issue and ignores the evidence to which we refer. Instead it quotes a general statement of Pennsylvania law in Commonwealth v. Reilly, 519 Pa. 550, 565-66, 549 A.2d 503, 510-11 (1988), which has nothing to do with this issue, and refers to Vujosevic which involved different offenses in a different state and thus is unrelated to the facts and jury charge in this case. Remarkably, Reilly is directly contrary to the point for which the dissent uses it, for in Reilly the Supreme Court of Pennsylvania affirmed a third degree murder conviction entered by a judge in a bench trial in which, based on psychiatric evidence presented by the defendant that she was insane, the court found that she "did not form the specific intent to kill." Thus, Reilly supports our conclusion that the jury could have used the psychiatric evidence in this case as a foundation for a third degree murder verdict
 
 
 [16]
 See Commonwealth v. Moody, 476 Pa. at 226-27 n. 4, 382 A.2d at 443 n. 4, with respect to age as a mitigating circumstance
 
 
 [17]
 Schad was based on a harmless error analysis. We cannot be grudging in making such an analysis, for the Supreme Court has held that a harmless error analysis should be made even when an involuntary confession is admitted into evidence. See Arizona v. Fulminante, --- U.S. ----, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Of course, it is clearly established that a harmless error analysis may be appropriate even when there is an erroneous jury instruction of constitutional dimension. See Pope v. Illinois, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987). Indeed, we made exactly that analysis recently in Rock v. Zimmerman, 959 F.2d 1237, 1249-52 (in banc), in affirming a district court order denying a petition for habeas corpus in a murder case
 
 
 [18]
 In this regard, we point out that it is not surprising that Beck has been limited by Schad, because Beck represents an exception to the broader principle of law that it is presumed that a jury will faithfully follow its instructions. Francis v. Franklin, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985). It is interesting that the dissent, by focusing on the claim that without an option to return a verdict of not guilty by reason of insanity, "the jurors reasonably could have concluded that a verdict of not guilty would have released this man to the streets, to kill again," typescript at 25, demonstrates how clearly the penalty verdict rendered any error in the charge harmless in this case. Certainly the jury would not have thought that if it sentenced Geschwendt to life imprisonment he would have been released, for no reasonable person can equate the imposition of a life sentence to an authorization to release a defendant. The dissent deals with the jury's actions in returning six death penalties rather than life imprisonment by ignoring it
 
 
 [19]
 Actually there is some question as to whether a state must allow a defendant to assert an insanity defense. See Foucha v. Louisiana, --- U.S. ----, ----, 112 S.Ct. 1780, 1789, 118 L.Ed.2d 437 (1992) (O'Connor, J., concurring); Ake v. Oklahoma, 470 U.S. 68, 87, 91, 105 S.Ct. 1087, 1098, 1100, 84 L.Ed.2d 53 (1985) (Rehnquist, J., dissenting). It appears that we have left the issue open. See United States ex rel. Smith v. Baldi, 192 F.2d 540, 544 (3d Cir.1951), aff'd, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953). But we need not express an opinion on the point as Pennsylvania allows the defense. We note that the dissent argues that "The Supreme Court has elevated a defendant's opportunity to be a 'committed acquittee' to a right protected by the due process clause," at 896, and that we have not come "to grips with this key issue," at 896. Of course, there is nothing to come "to grips with," as the Supreme Court has not held that a state must provide a special verdict of not guilty by reason of insanity and thus create a class of committed acquittees. Rather, in Foucha v. Louisiana, which the dissent quotes, the Court was simply dealing with the issue of how long a defendant acquitted by reason of insanity pursuant to a state special verdict procedure could be confined. Obviously there is no way to read Foucha to support a conclusion that the state must provide for a class of committed acquittees. The dissent also cites Jones v. United States, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983), for the proposition that Geschwendt had a right to become a "committed acquittee." The very first sentence in Jones demonstrates that the case is not applicable to the problem at hand. "The question presented is whether petitioner, who was committed to a mental hospital upon being acquitted of a criminal offense by reason of insanity, must be released because he has been hospitalized for a period longer than he might have served in prison had he been convicted." 463 U.S. at 356, 103 S.Ct. at 3045
 
 
 [20]
 We also point out that a criminal case is over whether a defendant is acquitted on the merits or by reason of insanity. See Foucha v. Louisiana, --- U.S. ----, ----, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992) (a defendant who is found not guilty by reason of insanity "may not be punished"). Thus, it is the defendant's current mental condition rather than that as of the time of the offense which is significant after an acquittal. Furthermore, a verdict finding a defendant not guilty by reason of insanity does not establish that a defendant is still insane and is therefore in need of treatment and confinement, though it is no doubt reasonable to presume in the first instance that that is the fact. Id. at ----, 112 S.Ct. at 1783. Therefore, Mulgrew only required an instruction that psychiatric treatment and confinement is "possible" after a verdict of not guilty by reason of insanity. Accordingly, it would be reasonable for a state to treat insanity like other defenses at a trial such as entrapment or self defense which are considered by the jury in arriving at a general verdict, although we are aware that this is not the practice
 
 
 [21]
 We do not know with certainty what procedure Pennsylvania would have followed if Geschwendt had been found not guilty nor are we concerned with it, for the issue before us does not turn on the protections the public would have received from an acquitted Geschwendt. That is a matter separate from the question of whether the Commonwealth was required to provide for a not guilty verdict by reason of insanity
 
 
 [22]
 It is ironical that, notwithstanding Geschwendt's due process claim, in a very significant way the proceedings at the trial gave him more protection than was required by federal due process, for the trial court charged the jury that the Commonwealth had the burden to prove he was sane beyond a reasonable doubt, apparently as a matter of Pennsylvania law, even though his due process rights would not have been infringed if the burden of proof on the issue had been placed on him. See Foucha v. Louisiana, --- U.S. ----, ----, 112 S.Ct. 1780, 1789, 118 L.Ed.2d 437 (1992) (O'Connor, J., concurring)
 
 
 [23]
 This issue of whether the attorney was incompetent was in itself not exhausted in the state courts but we can hardly avoid deciding it, for we are obliged to decide whether Geschwendt exhausted his remedies on his principal claim that the trial court erred in failing to instruct the jury that it could find him not guilty by reason of insanity. As we explain in the accompanying text, the attorney did properly raise the form of verdict issue in the Supreme Court and thus we conclude that Geschwendt did exhaust his jury instruction claim on the direct appeal. We therefore necessarily hold that the attorney was not ineffective. In any event, it is appropriate that we decide the ineffective counsel issue, as we are satisfied that Geschwendt has not presented a colorable federal claim on the point, and because we see no point in protracting the matter so many years after the original convictions. See Granberry v. Greer, 481 U.S. 129, 134-35, 107 S.Ct. 1671, 1675, 95 L.Ed.2d 119 (1987); Evans v. Court of Common Pleas, 959 F.2d 1227 (3d Cir.1992); Zettlemoyer v. Fulcomer, 923 F.2d at 309-10
 
 
 [1]
 Byron, Don Juan, Canto I, St. 117
 
 
 [2]
 Stuart Taylor, Jr., Hinckley Is Cleared But Is Held Insane in Reagan Attack, N.Y. Times, June 22, 1982, at A1; see United States v. Hinckley, 525 F.Supp. 1342, 1345-49, clarified, 529 F.Supp. 520 (D.D.C.1981), affirmed, 672 F.2d 115 (D.C.Cir.1982)
 
 
 [3]
 Dahmer Changes Plea To Guilty But Insane, N.Y. Times, Jan. 14, 1992, at A19; Edward Walsh, Jury To Decide Dahmer's Culpability, Wash. Post, Jan. 27, 1992, at A3; Dirk Johnson, Milwaukee Jury Says Dahmer Was Sane, N.Y. Times, Feb. 16, 1992, § 1, at 24; see Wis.Stat.Ann. § 971.06(1)(d) (West 1991); State v. Shegrud, 131 Wis.2d 133, 137, 389 N.W.2d 7, 9 (1986), cert. denied, 479 U.S. 1037, 107 S.Ct. 891, 93 L.Ed.2d 843 (1987)
 
 
 [4]
 On his retirement after 23 years on the Supreme Court, as quoted in the New York Herald Tribune, August 30, 1962, reprinted in Ruggero J. Aldisert, The Judicial Process 627 (1976)
 
 
 [5]
 Notwithstanding the assumption in a few authorities that the Act of 1860, as amended, was "repealed and replaced" by the Mental Health and Mental Retardation Act of 1966, see, e.g., Commonwealth ex rel. DiEmilio v. Shovlin, 449 Pa. 177, 180, 295 A.2d 320, 322 (1972), a careful examination of legislative activity reveals that the Act of 1860 remained in effect in the form of 19 Pa.Stat.Ann. § 1351 (Purdon 1964) until its repeal in 1978 by the Act of April 28, 1978, P.L. 202, § 2(a), 42 Pa.Cons.Stat. § 20002(a) (Supp.1982). See 19 Pa.Stat.Ann. §§ 1351-1354 (Purdon Supp.1965 to 1981) (stating that "ss 1351 to 1354 [are] [r]epealed [by] 1978, April 28, P.L. 202, No. 53, § 2(a), effective June 27, 1980"); Commonwealth v. Geschwendt, 500 Pa. 120, 139 n. 3, 454 A.2d 991, 1001 n. 3 (1982) (Roberts, J., dissenting) ("The Act of 1860 was repealed by the Legislature in the Judiciary Act Repealer Act, Act of April 28, 1978, P.L. 202, § 2(a), 42 P.S. § 20002(a) (Supp.1982), and replaced by 42 Pa.C.S. § 1722(a)(1)."). That the annotators of section 4413 of the Mental Health and Mental Retardation Act of 1966 included the Act of 1860, as amended, as a "cross reference" to section 4413 further suggests that the legislature intended the two statutes to co-exist. This cross reference stated: "Proceedings after acquittal on grounds of insanity, see 19 P.S. § 1351." 50 Pa.Stat.Ann. § 4413 (Purdon 1969)
 
 
 [6]
 Under current Pennsylvania law, a defendant asserting a defense of insanity is entitled to an instruction on "four possible verdicts": guilty, not guilty, not guilty by reason of insanity and guilty but mentally ill. Commonwealth v. Trill, 374 Pa.Super. 549, 567, 543 A.2d 1106, 1115 (1988), appeal denied, 522 Pa. 603, 562 A.2d 826 (1989). The legislature added the fourth alternative verdict in 1982, see 18 Pa.Cons.Stat.Ann. § 314 (Purdon 1983), to allow a jury to find an individual who was mentally ill but not insane at the time of the offense "guilty but mentally ill." This option provides for both treatment and punishment of the offender. Trill, 374 Pa.Super. at 578, 543 A.2d at 1120